723 A.2d 588

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. D.G., DEFENDANT–APPELLANT.

Argued September 28, 1998—Decided February 9, 1999.

*Robert L. Sloan*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney; *Mr. Sloan* and *Quentin D. Driskell*, Designated Counsel, on the briefs).

*Michael J. Williams*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

GARIBALDI, J.

In this appeal we again confront the critical and continually recurring problem of the admissibility of a child's extrajudicial statements regarding allegations of sexual abuse. Specifically, we must determine whether under the tender years exception to the hearsay rule, *N.J.R.E.* 803(c)(27), the testimony of a relative regarding the child's extrajudicial statements about the sexual assault and a videotaped police interview of the child that contained a seven minute gap in the taping are admissible.[1]

## I.

Defendant's alleged victim was Michelle,[2] his eight year old step-daughter. Michelle's mother married defendant in 1989, when Michelle was four and a half years old. Together, her mother and defendant had two more children. In January 1993, Michelle, her mother and her siblings moved from Virginia to New Jersey. They stayed with Michelle's great-grandmother until their new home in Lower Township, New Jersey was ready. On Martin Luther King weekend, defendant, an enlisted man in the

---

[1] When the Rules of Evidence were revised in 1993, the Supreme Court Committee on the Rules of Evidence ("Evidence Committee") initially recommended that Rule 63(33) be deleted. 1998 Report at 15–16. When members of the law enforcement community objected, however, the Evidence Committee recommended that Rule 63(33) be retained and re-enacted as *N.J.R.E.* 803(c)(27) and that the law enforcement community be given "an adequate opportunity" to "air" its concerns. *Id.* at 15. The Evidence Committee in its 1998 Report again recommended that *N.J.R.E.* 803(c)(27) be deleted and proposed that new rules *N.J.R.E.* 804(a)(5) and 804(b)(8) be adopted in lieu thereof. *Id.* at 15–16. The Court approved the Evidence Committee's recommendation and put the Legislature and the Governor on notice of its adoption pursuant to *N.J.S.A.* 2A:84A–35. The evidence rule amendments will take effect July 1, 1999, unless the Court takes further action or, consistent with *N.J.S.A.* 2A:84A–36, the Legislature cancels the amendments by a Joint Resolution signed by the Governor. [However, the recommendation has not been adopted by Joint Resolution of the Legislature and signed by the Governor pursuant to *N.J.S.A.* 2A:84A–38.] Accordingly, this case is governed by *N.J.R.E.* 803(c)(27).

[2] This is a pseudonym.

Navy stationed in Virginia, obtained a weekend pass and came to New Jersey to visit his family. During his visit, he asked Michelle to pick up pizzas for dinner with him. On the way to get the pizza, they stopped at the family's new home so defendant could search among some boxes. Michelle played with some Matchbox cars in the living room while defendant looked through the boxes. Michelle stated that defendant called her into the master bedroom and told her to lie down on a mattress. He laid down next to her and proceeded to place his hands under her shirt. Defendant touched and squeezed her breasts, fondled her vagina, and kissed her on the mouth. He then pulled off her shirt and pants, removed his own pants and climbed on top of her. Michelle testified that defendant put his "dinky" into her and then cleaned up the "wet stuff" on the bed with a towel. He then told her to clean herself up and get dressed. The pair proceeded to the pizza place and then returned to the great-grandmother's house.

Approximately three weeks later, on February 6, 1993, Michelle was playing in a bedroom with the younger daughters of her mother's cousin, Sandra Jones.[3] Michelle refers to Sandra Jones as Aunt Sandy. Aunt Sandy entered the room and found Michelle lying on the bed between her two younger daughters, ages five and three. The two young girls had their pants down to their knees and one of them had her hand down Michelle's pants. Aunt Sandy testified that she "freaked out" when she saw the girls and called them "names." She ordered Michelle to sit in the living room and told her that she was very upset with her. Michelle testified that she "got in trouble" after her aunt came into the room. Aunt Sandy testified that Michelle did not cry but seemed scared. Aunt Sandy took her daughters to the bathroom, washed them and attempted to "deprogram" them. The older girl told her mother that Michelle wanted her to "lick her pee pee."

---

[3] This is a pseudonym.

Forty-five minutes later, Aunt Sandy returned to the living room and questioned Michelle about the incident. Aunt Sandy testified that she had calmed down by then, but Michelle seemed nervous. Aunt Sandy asked Michelle what had made her act that way and where she had learned it. At first, Michelle blamed the behavior on Aunt Sandy's daughters. However, after more questioning, she revealed that "Daddy David" did those things to her. Michelle testified on direct examination that Aunt Sandy asked her, "What made you do this? Did anybody ever do anything like this to you to make you do this?" She then told Aunt Sandy about the events that occurred in January at her family's new home. She told her Aunt that "Daddy David" stuck his "thing" in her and then "peed" on the bed, wiping it up with a towel. Michelle begged her Aunt not to tell her mother.

Aunt Sandy immediately called one of Michelle's aunts and Michelle repeated the allegation to her. Michelle's mother was called and Aunt Sandy told her what Michelle had said. They called the police and defendant was charged with committing an act of sexual penetration on a child under the age of thirteen and with debauching the morals of a child for whom he had a legal duty of care.

On February 10, 1993, Detective Marie Hayes, a female detective from the Child Abuse Unit of the Cape May County Prosecutor's office conducted a videotaped interview of Michelle. Aunt Sandy accompanied Michelle to the interview and waited in the hall while Michelle and Hayes spoke. Michelle mentioned to Hayes that Aunt Sandy promised her a surprise if she told the truth. Initially, however, Michelle said very little. She said only that defendant had touched her "boobies." The detective persistently tried to get Michelle to say more; Michelle would not. The detective sensed that Michelle was scared and was holding back. She stopped the interview when Michelle's nose began to bleed and Hayes brought Michelle to the bathroom. The detective then spoke separately with Aunt Sandy and asked her to reassure Michelle about talking to her. Aunt Sandy then placed Michelle

on her lap and reassured her that she should tell the detective the truth. Hayes testified that she was present during the entire exchange. After seven minutes, Michelle and Hayes returned to the interview room and resumed taping the interview. Michelle proceeded to allege that defendant had put his "penis" into her "vagina."

Six days later, Michelle was examined by Dr. Finkel, a pediatrician specializing in cases of sexual abuse, to determine if there were any physical and/or psychological "residual effects" of the alleged sexual attack. After receiving a medical history from Michelle's mother and background information from a caseworker, Dr. Finkel interviewed Michelle alone. Under questioning about whether defendant had touched her, Michelle said that defendant rubbed his penis on her "private." Using an anatomical model with genitalia, Michelle demonstrated what Dr. Finkel interpreted as vulvar coitus. The physical examination disclosed no injury or "residual effect" to the genitalia. According to Dr. Finkel, however, that result is not unusual because even in rape cases where extreme force is used, resultant injuries can be undetectable a week later. Based on Michelle's oral description of the events and her behavior with anatomically correct dolls, Dr. Finkel found that there was a high likelihood that sexual abuse had occurred.

Prior to the trial, Michelle's mother beat her in an attempt to get her to recant her allegations. Michelle was sent to live briefly with her grandfather and then with another aunt. Eventually, she was sent to live out-of-state with her biological father. When she returned to New Jersey, she accused him of sexual assault as well. That account was so similar to the charge against defendant that they both included the detail of the perpetrator using a towel to wipe himself and the bed after ejaculation. Charges were never pressed against Michelle's biological father. At the time of defendant's trial, Michelle was living in a foster home.

On September 16, 1994, Dr. Finkel examined Michelle again, this time with regard to her claims against her biological father. Michelle alleged three separate incidents involving her biological

father and recanted her original allegations concerning defendant. Over the course of the next six months, Michelle also told Aunt Sandy, a worker at the Division of Youth and Family Services, an investigator from the Public Defender's office, the prosecutor, and Detective Hayes that she had been lying when she said that defendant had sexually abused her. Michelle, at various times during this period, also recanted her recantation. She claimed that when she denied that defendant sexually abused her she was only trying to make her mother happy.

On December 6, 1993, at his attorney's urging, defendant entered a plea of guilty to aggravated sexual contact, in exchange for the prosecutor's recommendation of a sentence of 364 days in county jail. However, at defendant's sentencing, he so persistently maintained his innocence that the trial court refused to accept the plea agreement. The case was set for trial.

On April 20, 1995, Michelle met with the prosecutor and Detective Hayes. She initially told them that defendant did not abuse her and then, upon further questioning, told them that her mother had told her to lie and deny the abuse. Michelle's mother was charged with hindering the prosecution and witness tampering.

A pre-trial hearing was held pursuant to *N.J.R.E.* 104(a). Relying on *N.J.R.E.* 803(c)(27), the tender years exception, the prosecution sought the admission of Hayes' videotaped interview of Michelle. Defendant argued that the videotape was untrustworthy because of the seven minute gap and Aunt Sandy's intervention. After viewing the videotape and listening to Detective Hayes explain the circumstances surrounding the creation of the video, the trial court deemed Michelle's statements on the tape to be sufficiently trustworthy to warrant admission of the videotape.

The trial began on May 1, 1995. On May 3, 1995, Michelle's mother served defendant with divorce papers. Also on that date the prosecutor dismissed with prejudice the charges against Michelle's mother.

Michelle was the first witness at trial. Her testimony, according to the trial court, was "painful to watch." She had "a lot of trouble focusing on questions" and there were one to two minute pauses between answers. She seemed to be under such a "tremendous amount of stress" and to be so "disoriented," that the trial court inquired if anyone was "attending to her emotional state."

Her trial testimony also differed in detail from her prior statements to the police and social service personnel. For example, while she initially told authorities that defendant threw her on the bed and merely unzipped his pants, she testified that he asked her to lie down on the bed and took his pants off. Similarly, she initially said she touched his penis, but then denied this at trial. She vacillated so many times at trial that the prosecutor was impelled to impeach her. For example, when Michelle repeatedly stated at trial that she had not heard defendant's voice on a speaker phone trying to persuade her mother that he was innocent, the prosecution played an audio tape where Michelle could be heard telling Hayes that her mother would put the speaker phone on so that Michelle could hear defendant argue his version of events.

Michelle's mother testified for the prosecution. She testified that defendant "was a fanatic" about toweling himself off "after intercourse even after ejaculating inside" her. She denied ever telling Michelle that she did not believe her accusations against defendant and denied telling Michelle to lie about what happened. However, after being impeached by the prosecution, she admitted "slapping" Michelle and telling her that she did not believe the assault ever happened. Finally, despite the fact that she had told defense investigators that Michelle had "a problem with lying" and was "telling so many stories and so many lies, she's getting caught up in her lies," the mother testified that Michelle "tell[s] the truth."

Aunt Sandy also testified. Pursuant to the fresh complaint exception to the hearsay rule, she was allowed, over the defense's

objection, to testify to what Michelle had said to her on February 6, 1993. Aunt Sandy testified that Michelle said defendant "stuck his thing" in her. Corroborating Michelle's trial testimony, Aunt Sandy testified that Michelle told her that defendant put her on the bed and started playing with her. When defendant was "done," he "peed on the bed and wiped it up with a towel." Aunt Sandy also testified that Michelle begged her not to tell Michelle's mother because the mother would "beat" her. Aunt Sandy testified that Michelle said she recanted so that she would not be beaten by her mother.

Testifying as an expert on child sexual abuse accommodation syndrome ("CSAAS"), Dr. Julie Ann Lippman observed that sexually abused children often come to believe that the non-offending parent, i.e., the one who did not sexually abuse them, will not believe them. Sexually abused children are also likely to recant. If a child discloses her abuse and her parents get angry at her, then it is "absolutely reasonable" that the child would just say " 'never mind, it didn't happen.' "

The videotape was played for the jury. Detective Hayes testified to and was cross-examined concerning the irregular circumstances surrounding the creation of the videotape. She stated that during the interview Michelle's face would "become like a blank stare, almost as if a person who has been frightened would just stare at you."

Mary Dunn, a D.Y.F.S. investigator, was called as a defense witness. She recalled that she interviewed Michelle on August 5, 1994, about allegations of sexual abuse involving her biological father. When asked about sexual abuse by defendant, Michelle said that he did not molest her. She had made the allegation because she did not want her mother to remain married to defendant.

In his testimony, defendant explained that he married Michelle's mother in 1989. They had two children and Michelle's mother had two children, including Michelle, from a prior marriage. Although his relationship with Michelle was "pretty good," the marital

relationship was "not very good," with frequent fights and separations. While on leave from the Navy for a holiday weekend in January 1993, defendant took Michelle to pick up pizza and stopped at the family's future home on the way. Defendant searched boxes there for wire for a car radio and Michelle played with toy cars. After picking up pizzas, they rejoined the rest of the family in less than an hour. He denied that any sexual contact occurred.

The trial court charged the jury on prior inconsistent statements and on the child sexual abuse accommodation syndrome. After nine hours of deliberation, the jury was hopelessly deadlocked on the aggravated sexual assault charge. It did, however, convict defendant of the lesser-included offense of second-degree sexual assault (*N.J.S.A.* 2C:14-2b) and second-degree endangering the welfare of a child (*N.J.S.A.* 2C:24-4a). Defendant filed a motion to set aside the verdict and grant defendant a new trial. That motion was denied and defendant was sentenced to a presumptive term of seven years. He appealed to the Appellate Division.

The Appellate Division concluded that Michelle's statements to Aunt Sandy were admissible at trial. However, the Appellate Division explained that the testimony was inadmissable under both the fresh complaint exception and the excited utterance exception to the hearsay rule. Rather, the Appellate Division asserted that the child's out-of-court allegations regarding sexual abuse were admissible under the tender years exception to the hearsay rule, *N.J.R.E.* 803(c)(27). The tender years exception requires that the court conduct a hearing and find that "on the basis of the time, content, and circumstance of the statement there is a probability that the statement is trustworthy." *N.J.R.E.* 803(c)(27). The Appellate Division concluded that "[i]f the issue of the admissibility of Sandra's testimony under the tender years exception had been presented to the court before trial, the testimony would very likely have been held to comply with that rule [and that] any error in the admission of Sandra's testimony was harmless beyond a reasonable doubt." Furthermore, the Appellate Division held that

the seven minute gap in the videotaped interview did not render the tape inadmissible. The reason for the seven-minute gap was presented to the jury by direct and cross-examination thereby relieving it of any prejudicial effect.

In his petition for certification, defendant alleges that Michelle's out-of-court statements to Aunt Sandy and to Detective Hayes were not sufficiently trustworthy to be admitted under the tender years exception, *N.J.R.E.* 803(c)(27). He also alleges that the improper admission of Michelle's unreliable out-of-court statements given in response to coercive and suggestive questioning denied him the right to confront witnesses and the right to due process of law and a fair trial in violation of *U.S. Const. Amend.* VI and XIV, section 1, and *N.J. Const.,* art. I, ¶ 10. Specifically, defendant claims that Aunt Sandy forced a statement from Michelle after keeping her isolated for forty-five minutes, screaming at her, and then interrogating her. He contends that the error in admitting that testimony is compounded by the fact that the trial court did not give the jury an instruction concerning the limited uses to which such testimony could be put. Moreover, if, as the Appellate Division claims, the testimony was admissible under the tender years exception to the hearsay rule, defendant was still prejudiced by the fact that he was not given the advance notice required by *N.J.R.E.* 803(c)(27) and therefore, was not prepared to rebut the testimony. Finally, defendant alleges that the videotape was unreliable because it contained a seven minute gap wherein Aunt Sandy was allowed to speak with and thus influence Michelle. In defendant's supplemental brief, he alleges that Hayes' improper and coercive interview techniques also rendered the videotape unreliable. We granted defendant's petition for certification, 152 *N.J.* 364, 704 *A.*2d 1299 (1998), and now reverse and remand for a new trial.

## II.

### A.

In *State v. D.R.,* 109 *N.J.* 348, 363, 537 *A.*2d 667 (1988), we held that the adoption of a tender years exception to the hearsay rule

was "necessary and appropriate in order to authorize, under certain circumstances, the admissibility in a criminal prosecution, of a child's out-of-court statement concerning acts of sexual abuse." The Court recognized that while the tender years exception "serves legitimate and important law enforcement interests," it also "threatens the equally significant interests of the defendant, who seeks to exercise the basic rights of confrontation and cross-examination." *Id.* at 369, 537 *A.*2d 667. Addressing those concerns, the Court held that only out-of-court statements that possess "sufficient indicia of reliability" should be admitted. *Id.* at 363, 537 *A.*2d 667. Further, while the out-of-court statements themselves are by definition "insulated from cross-examination," a requirement that the child testify at trial would at least afford the defendant a "limited confrontation." *Id.* at 370, 537 *A.*2d 667. The Legislature and the Governor concurred with the Court's recommendation and, in 1989, *N.J. Evid. R.* 63(33), a tender years exception to the hearsay rule was adopted.

In 1993, Rule 63(33) was re-enacted as *N.J.R.E.* 803(c)(27). *N.J.R.E.* 803(c)(27) is virtually identical to Rule 63(33)[4] and provides:

Statements by a child relating to a sexual offense. A statement by a child under the age of 12 relating to sexual misconduct committed with or against that child is admissible in a criminal, juvenile, or civil proceeding if a) the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement at such time as to provide him with a fair opportunity to prepare to meet it; b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and c) either i) the child testifies at the proceeding, or ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601 [the general competency rule].

[*N.J.R.E.* 803(c)(27).]

---

. 4 The only material difference between the two is that *N.J.R.E.* 803(c)(27) permits the statements to be used in juvenile and civil proceedings as well as criminal ones.

In *Idaho v. Wright,* 497 *U.S.* 805, 814, 110 *S.Ct.* 3139, 3146, 111 *L.Ed.*2d 638, 651 (1990), the Supreme Court set forth a general approach for determining whether "statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause." Where the hearsay evidence "falls within a firmly rooted hearsay exception," reliability can be "inferred." *Id.* at 815, 110 *S.Ct.* at 3146, 111 *L.Ed.*2d at 652. If hearsay evidence "does not fall within 'a firmly rooted hearsay exception' and is thus presumptively unreliable and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by a 'showing of particularized guarantees of trustworthiness.'" *Id.* at 817, 110 *S.Ct.* at 3147, 111 *L.Ed.*2d at 653 (quoting *Lee v. Illinois,* 476 *U.S.* 530, 543, 106 *S.Ct.* 2056, 90 *L.Ed.*2d 514 (1986)).

Declining to "endorse a mechanical test for determining 'particularized guarantees of trustworthiness,'" the Court identified a number of key factors that courts might consider: spontaneity, consistency of repetition, lack of motive to fabricate, the mental state of the declarant, use of terminology unexpected of a child of similar age, interrogation, and manipulation by adults. *Id.* at 821–22, 827, 110 *S.Ct.* at 3150, 3153, 111 *L.Ed.*2d at 656, 659–60. That list of factors is not exhaustive, and "courts have considerable leeway in their consideration of appropriate factors." *Id.* at 822, 110 *S.Ct.* at 3150, 111 *L.Ed.*2d at 656. The factors must, however, relate to "whether the child declarant was particularly likely to be telling the truth when the statement was made." *Ibid.* The hearsay statement must possess "inherent trustworthiness"; the court may not point to corroborating evidence in an attempt to demonstrate the trustworthiness of the hearsay statement. *Id.* at 822–23, 110 *S.Ct.* at 3152, 111 *L.Ed.*2d at 657. The "presence of corroborating evidence" merely indicates "that any error in admitting the statement might be harmless." *Ibid.*

*N.J.R.E.* 803(c)(27) similarly requires that the court "find[ ], in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a

probability that the statement is trustworthy." *N.J.R.E.*
803(c)(27)(b). Courts applying 803(c)(27) and its predecessor, *N.J.
Evid. R.* 63(33), have looked to the trustworthiness factors out-
lined in *Wright* when determining if a child victim's out-of-court
statements are admissible. *See State in Interest of S.M.*, 284
*N.J.Super.* 611, 621, 666 *A.*2d 177 (App.Div.1995) (upholding con-
viction after admissibility of tender years statement was chal-
lenged where it was "clear that the court was fully aware of its
responsibility to determine trustworthiness as outlined in *Idaho v.
Wright*"); *State v. C.H.*, 264 *N.J.Super.* 112, 124, 624 *A.*2d 53
(App.Div.) (acknowledging that the following *Wright* factors are to
be considered when determining if an out-of-court statement is
sufficiently trustworthy to be admissible under the tender years
exception to hearsay: "spontaneity and consistent repetition . . .
mental state of the declarant . . . use of terminology of a child of
similar age . . . [and] lack of motive to fabricate"), *certif. denied,*
134 *N.J.* 479, 634 *A.*2d 526 (1993); *State v. J.G.*, 261 *N.J.Super.*
409, 421, 619 *A.*2d 232 (App.Div.) (finding tender years hearsay
statement trustworthy when it "disclosed a sexual knowledge
beyond the ken of a young child" and was made "without prompt-
ing"), *certif. denied,* 133 *N.J.* 436, 627 *A.*2d 1142 (1993); *State v.
Roman,* 248 *N.J.Super.* 144, 153, 590 *A.*2d 686 (App.Div.1991)
(noting that should prosecutor "renew his application for admis-
sion of the hearsay statement pursuant to *Evid. R.* 63(33), the
issue of trustworthiness should be fully explored and decided"
using the *Wright* factors); *State v. M.Z.*, 241 *N.J.Super.* 444, 450,
575 *A.*2d 82 (Law Div.1990) (noting that in order to find a
statement "trustworthy" under 63(33), the "court must have some
indicia of credibility similar in nature to those itemized in the
other hearsay rules").

▮ Applying the *Wright* factors to this case, a trial court could
conclude that Michelle's statements to Aunt Sandy did not possess
"particularized guarantees of trustworthiness." The situation un-
der which Michelle disclosed the sexual abuse was very stressful.
Michelle did not spontaneously divulge information concerning the
assault to Aunt Sandy, but rather Aunt Sandy interrogated her

after finding her performing questionable acts while at play. Michelle's mental state can best be described as agitated; Aunt Sandy was screaming at her and Michelle was afraid she was in trouble for what she had done. Michelle initially lied, saying that her cousins had precipitated the sexual contact. Although she eventually named defendant as the culpable party, there was no consistency of repetition; when speaking to parties other than Aunt Sandy, Michelle claimed that it was her real father and not defendant who was responsible. Moreover, because neither the trial court nor the appellate court made findings of fact concerning the admissibility of Michelle's statements to Aunt Sandy under the tender years exception, it is not possible to determine whether either court complied with the Supreme Court's admonition in *Wright* that the presence of corroborating evidence may not be used as a basis for finding the declarant's statements to have been trustworthy when made. *See Wright, supra,* 497 *U.S.* at 823, 110 *S.Ct.* at 3152, 111 *L.Ed.*2d at 657.

To determine if the extrajudicial statements have the appropriate indicia of reliability required for admission, *N.J.R.E.* 803(c)(27) requires that the trial court conduct a hearing prior to their admission. In this case the trial court did not conduct a *N.J.R.E.* 104(a) hearing with respect to the admission of Aunt Sandy's testimony. The appellate court, however, concluded that "any error in the admission of Sandra's testimony was harmless beyond a reasonable doubt." We disagree. Where tender years testimony was admitted without the benefit of either a *N.J.R.E.* 104(a) hearing or a statement of findings concerning trustworthiness, the Appellate Division has observed "[T]he vital issue of guilt was exceedingly close and any error that could have tipped the credibility scale would have to be regarded as plain error. . . . A fair trial in child abuse cases is particularly important. In such sensitive cases, we must tread a measured path that avoids ignoring the reality of child abuse and avoids as well the possibility of unjust conviction." *State v. W.L.,* 292 *N.J.Super.* 100, 117–

18, 678 *A*.2d 312 (App.Div.1996) (internal citation and quotation omitted).

Further, not only did Michelle testify as to the identity of the abuser, but Dr. Finkel, Detective Hayes, and Aunt Sandy, also named defendant as the culprit. Additionally, the videotape was played for the jury and on the tape Michelle accuses defendant of sexual abuse. The jury thus heard four times not just that Michelle had been abused, but that defendant was the abuser. Even if, as the trial court averred, Aunt Sandy's testimony was merely corroborative, to have admitted it, could still be plain error. Given the victim's frequent recantations, that the prosecutor herself was forced to impeach Michelle on the stand, and that Michelle made identical allegations against her biological father, credibility was at issue. The corroborative statements that came in under the tender years exception to hearsay may well have tipped the scale. We observe that in considering the admission into evidence of several repetitive corroborative statements under the tender years exception, a trial court should be cognizant of its right under *N.J.R.E.* 403 to exclude evidence, if it finds in its discretion, that the prejudicial value of that evidence substantially outweighs its probative value.

*N.J.R.E.* 803(c)(27) requires the court to find, in a hearing conducted pursuant to *N.J.R.E.* 104(a), that on the basis of the time, content and circumstances of the statement, there is a probability that the statement is trustworthy. Without such a hearing, the statements cannot properly be admitted under the tender years exception to the hearsay rule. The trial court may or may not determine that Michelle's statements carry with them the necessary indicia of reliability and trustworthiness. However, without a pretrial hearing on notice to defendant the testimony should not have been admitted. Therefore, on remand there must be a *N.J.R.E.* 104(a) hearing regarding the trustworthiness of Aunt Sandy's statement and its admissibility into evidence.

### B.

*N.J.R.E.* 803(c)(27)(a) also provides that the proponent of the tender years statement must "make[ ] known to the adverse

party his intention to offer the statement and the particulars of the statement at such time as to provide him with a fair opportunity to meet it." Here, because Aunt Sandy's testimony concerning Michelle's allegations to her was admitted under the fresh complaint doctrine, no such notice was given. Rather, during a sidebar at trial immediately before Aunt Sandy was to take the stand, the prosecutor announced that the State anticipated calling her and having her testify about what Michelle told her. The record does not disclose whether, prior to that time, the defense was aware that Aunt Sandy would be called for that purpose. The defense made no objection at trial, did not ask for a continuance, and does not now demonstrate how it was prejudiced by the lack of notice. *See State in Interest of S.M.*, 284 *N.J.Super.* 611, 620, 666 *A.*2d 177 (App.Div.1995) (holding that failure to sustain defense objection that defendant received no notice concerning the prosecutor's intent to call tender years witness was not reversible error where defense was unable to demonstrate prejudice). *But see State v. W.L.*, 292 *N.J.Super.* 100, 113, 678 *A.*2d 312 (App.Div. 1996) (holding that giving notice to defendant on first day of trial would not likely give a "fair" opportunity to meet a psychiatrist's testimony regarding a young sexual assault victim). Because we are remanding for a *N.J.R.E.* 104(a) hearing, we need not decide whether failure to give the notice constituted reversible error. We emphasize, however, that the notice requirement is a critical element of *N.J.R.E.* 803(27)(c) and courts should be very reluctant to admit evidence under the tender years exception unless proper and timely notice has been given.

## III.

The trial court held a *N.J.R.E.* 104(a) hearing with regard to the admissibility of the videotape into evidence under the tender years exception. It viewed the videotape, heard the testimony of Detective Hayes, heard counsels' arguments about the admissibility and inadmissibility of the videotape, and concluded that the videotape statements were admissible under the tender years exception.

The trial court was persuaded, despite Detective Hayes' firm, persistent, and reassuring questioning, that "[t]here were absolutely no words put into that child's mouth in terms of the acts the child was alleging were inflicted upon her by her stepfather, the defendant." The Appellate Division agreed.

Nevertheless, defendant maintains that there was an insufficient guarantee of trustworthiness to warrant the admission of the videotape under the tender years exception because of Aunt Sandy's intervention, the seven minute gap and Detective Hayes' aggressive questioning. The State disagrees and asserts that Detective Hayes' questioning was not unduly suggestive, agreeing with the trial court that "absolutely no words were put into defendant's mouth." As conceded by defendant, Detective Hayes' questioning did not supply Michelle with the answers. Moreover, the State emphasizes that defendant had ample opportunity by cross-examining Michelle on the stand to address the factors such as spontaneity and constant repetition, the child's mental state, her use of language, and her possible motives to fabricate. *N.J.R.E.* 803(c)(27) provides that the hearsay statement must be trustworthy before it is admitted into evidence. We observe that although the ability at trial to confront Michelle might be relevant on whether the admission of evidence under the tender years exception constituted harmless error, it cannot be used to establish the trustworthiness of that evidence. That issue must be resolved before the evidence is admitted.

When assessing whether the gap in the interview, the talk with Aunt Sandy, and Detective Hayes' questioning render the interview unreliable, we consider *State v. Michaels*, 136 *N.J.* 299, 642 *A.*2d 1372 (1994). In that case the Court held that the likelihood of unreliable evidence from improper and suggestive interview techniques required a pre-trial taint hearing concerning the admission of the children's statements and testimony. *Id.* at 313–24, 642 *A.*2d 1372. "[T]he inculpatory capacity of statements indicating the occurrence of sexual abuse and the anticipated testimony about those occurrences requires that special care be taken to

ensure their reliability." *Id.* at 306, 642 *A*.2d 1372. Although such accounts of sexual abuse may be reliable, "our common experience tells us that children generate special concerns because of their vulnerability, immaturity, and impressionability, and our laws have recognized and attempted to accommodate those concerns, particularly in the area of child sexual abuse." *Id.* at 308, 642 *A*.2d 1372.

In assessing the importance of a child's initial statements, the *Michaels* Court recognized "that the 'investigative interview' is a crucial, perhaps determinative, moment in a child-sex-abuse case." *Id.* at 309, 642 *A*.2d 1372. "If a child's recollection of events has been molded by an interrogation, that influence undermines the reliability of the child's responses as an accurate recollection of actual events." *Ibid.* "[A]mong the factors that can undermine the neutrality of an interview and create undue suggestiveness are a lack of investigatory independence, the pursuit by an interviewer of a preconceived notion of what has happened to the child, the use of leading questions, and a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers." *Ibid.*

A review of Detective Hayes' questioning suggests that instead of conducting a neutral interview designed to provide Michelle with a fair opportunity to describe what happened, Detective Hayes simply assumed that Michelle's earlier statement to Aunt Sandy was accurate and continued the interview until Michelle eventually repeated it to her satisfaction. The most damaging evidence against defendant was elucidated primarily after the gap in the interview. During the pre-gap part of the interview, Michelle alleged little more than that the defendant was playing with her "boobies." When Hayes persisted, asking if anything else had happened, Michelle replied: "That's it" and then later: "I said everything that happened." Hayes then asked her the names of her private parts; Michelle responded: "[V]agina." When Hayes asked if anything else happened, Michelle shook her head no. Likewise, when Hayes asked if defendant did anything else,

Michelle again responded: "[N]o." Hayes again asked: "[W]as there ever anything else that happened between you and daddy?"; Michelle responded: "[N]o." Hayes then noted: "[S]ee, it's important that I know everything" and left to get a tissue. When Hayes returned, Michelle said without prompting: "Couldn't think about it because there is nothing else." Hayes then asked: "What did you tell Aunt Sandy?"; Michelle replied: "That, what I'm telling you." Hayes persisted: "When you told Aunt Sandy what happened, what did you tell her that daddy did?"; Michelle insisted: "Everything I told you." At this point, Hayes announced that the interview is over and took Michelle out to Aunt Sandy and, pulling Aunt Sandy aside, asked her to assure Michelle that it was all right to tell Hayes everything that happened. Seven minutes later, the interview resumed. Michelle blurted out: "Maybe if I tell, the whole, what else happened then I can get out of here." Hayes noted: "We were just out talking now okay, in the lobby and you told me that there was some more stuff that you want to tell me"; Michelle nods her head yes. That statement by Hayes indicates that more took place in the lobby during the seven minute gap than Aunt Sandy simply assuring Michelle that it was okay to tell Hayes the truth. Apparently, Michelle was talking to Hayes during the break. After the interview resumes, Michelle claimed that defendant touched her "vagina" with his "penis."

As we recognized in *Michaels*, an interview will not produce reliable evidence if it is based on "a preconceived notion of what has happened to the child" and includes "incessantly repeated questions," suggesting that the earlier answers are wrong. 136 *N.J.* at 309–10, 642 *A.*2d 1372. When persistent questioning did not persuade Michelle to change her account of the incident with defendant, Detective Hayes relied on intervention from Aunt Sandy to encourage Michelle to make further disclosures. Although Aunt Sandy did not discuss the incident with Michelle at that point, she was the same person to whom Michelle had previously made statements.

Aunt Sandy was also the person who offered Michelle a surprise for telling the truth, *i.e.*, repeating her previous account. As was recognized in *Michaels*, the reliability of a child's statements is undermined by "praise, cajoling, bribes and rewards, as well as resort to peer pressure." *Id.* at 310, 642 *A.*2d 1372. Although the questioning itself did not supply Michelle with the desired answers, any spontaneity in her answers was obliterated by the impact of "prior interrogation, prompting, or manipulation by adults[.]" *Idaho v. Wright, supra,* 497 *U.S.* at 826–27, 110 *S.Ct.* at 3152, 111 *L.Ed.*2d at 659.

Recently, the Appellate Division addressed the issue of admissibility of a police videotaped interview of a child victim of sexual assault that contained a break in the interview. In *State v. Smith,* 310 *N.J.Super.* 140, 708 *A.*2d 436 (App.Div.), *certif. granted,* 155 *N.J.* 587, 715 *A.*2d 990 (1998), the court found that the interview fell into two distinctive parts—the "interview" and the "reinterview," and held that only the portion of the interview that preceded the intermission could be displayed to the jury. We do not suggest that any break in the videotaped interview of a child victim of sexual assault automatically renders the second half of the videotape inadmissible. However, we do caution those professionals who conduct such interviews to avoid any activity that might call into question the reliability and trustworthiness of the information gathered after the break.

Each case will depend on its facts. In this case, the seven minute gap, the intervention of Aunt Sandy, Michelle's unknown conversation with Detective Hayes during the break, all call into question the validity of the second part of the interview, particularly because the most damaging evidence was eludicated after the break. To find that the videotape was admissible, the Appellate Division relied on the fact that the existence of the gap and the circumstances surrounding it were presented to the jury by direct and cross-examination. Neither the trial court nor the Appellate Division explicitly addressed the fact that Aunt Sandy's mere presence may have been coercive, and that when she initially

promised Michelle a reward for telling the "truth," and subsequently assured her it was all right to tell Detective Hayes what happened, Aunt Sandy was, in each instance, urging Michelle to repeat what she had previously told Aunt Sandy. *See* Robert G. Marks, Note, "Should We Believe the People Who Believe the Children?: The Need for a New Sexual Abuse Tender Years Exception Statute," 32 *Harv. J. on Legis.* 207, 222 (1995) ("An adult who suspects child abuse may aggressively try to convince the child to tell the 'truth.' .... To children, the 'truth' may simply become a code word for sexual abuse.").

The importance of Michelle's statements to Aunt Sandy and Detective Hayes to the State's case is readily apparent from the record. The State's evidence against defendant was not overwhelming. A medical examination revealed no evidence that Michelle had been sexually assaulted. Michelle subsequently made very similar allegations against her biological father and recanted her allegations against defendant. Accordingly, we find that the videotape after the break was not sufficiently reliable to have been admitted as evidence under *N.J.R.E.* 803(c)(27).

The judgment of the Appellate Division is reversed and the matter remanded for a new trial.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.