730 A.2d 311

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. TIMOTHY
A. SMITH, DEFENDANT–RESPONDENT.

Argued February 1, 1999—Decided June 4, 1999.

*Jordana Jakubovic,* Deputy Attorney General, argued the cause for appellant (*Peter Verniero,* Attorney General of New Jersey, attorney).

*Paul B. Halligan,* Assistant Deputy Public Defender, argued the cause for respondent (*Ivelisse Torres,* Public Defender, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

This appeal involves a conviction for aggravated sexual assault upon an eight-year-old female. The critical issues raised are whether permitting the child to testify before the jury on closed circuit television violated defendant's constitutional right to confrontation, and whether a videotaped statement made by the child to the police should have been excluded from the trial as unreliable evidence. In a published opinion, the Appellate Division ruled in favor of defendant on both issues. 310 *N.J.Super.* 140, 145–46, 708 *A.*2d 436 (1998). We granted the State's petition for certification, 155 *N.J.* 587, 715 *A.*2d 990 (1998), and now reverse on both issues.

I

T.I., the victim of the alleged aggravated sexual assault, was eight years old at the time of the offense on December 30, 1994. The offense occurred while T.I. was spending the night with her aunt, A.T., who lived with defendant at the same address. T.I. testified on closed circuit television because the trial court found that she was too frightened to testify before defendant or in an open courtroom. T.I. testified that the incident occurred while she was sleeping on a sofa in the living room at her aunt's apartment. She stated that while she was sleeping on her stomach, a person pulled down her pajama bottoms and digitally penetrated her from the back and front. Although T.I. could not see the perpetrator's face at the time, she saw that it was defendant as he was going to the bathroom. She also recognized the individual's voice as that of defendant when he said to her that he was sorry and that he thought she liked it. After the incident,

T.I. saw the perpetrator go into her aunt's bedroom. T.I. was able to see by light from a television in her aunt's bedroom.

T.I. spent the next day at her aunt's apartment without telling her aunt what had happened the night before. The aunt dropped T.I. off at T.I.'s mother's house the evening of December 31, 1994. After arriving at home, T.I. told her mother what had happened. Detective Edward R. Koenig interviewed T.I. on January 3, 1995, and videotaped the interview. A copy of the video tape was admitted as evidence even though it was duplicative of T.I.'s court testimony. T.I. used an anatomically-correct doll during the videotaped interview to demonstrate what defendant had done to her.

A.I., the child's mother, testified that there was a time when she and T.I. lived with A.T. During that period, defendant would visit the home almost daily. When T.I. was taken back to her home on December 31, 1994, T.I. told her mother what defendant had done to her. Although A.I. was not asked to repeat what T.I. said, A.I. stated that based on what T.I. told her, A.I. contacted the county prosecutor on January 3, 1995. The trial court immediately explained to the jury why that fresh-complaint evidence was admitted.

Defendant testified on his own behalf and denied the allegations. He stated that on the night in question he returned home intoxicated. He testified that after going to the bathroom, he went to bed without disturbing T.I.

The jury convicted defendant of first-degree aggravated sexual assault. He was sentenced to a custodial term of seventeen years without a parole disqualifier. On appeal, the Appellate Division reversed his conviction. *Smith, supra*, 310 *N.J.Super.* at 145–47, 708 *A.2d* 436. The panel reasoned that T.I.'s fear of testifying in the open courtroom was not a sufficient basis to allow the use of the closed circuit television under the principles enunciated in *Maryland v. Craig*, 497 *U.S.* 836, 110 *S.Ct.* 3157, 111 *L.Ed.*2d 666 (1990), and adopted by this Court in *State v. Crandall*, 120 *N.J.* 649, 577 *A.2d* 483 (1990). *Smith, supra*, 310 *N.J.Super.* at 145,

708 *A*.2d 436. The panel read *Craig* and *Crandall* as holding "that testimony by closed circuit television may only be employed to protect the infant from a face-to-face confrontation with the defendant." *Id.* at 144–45, 708 *A*.2d 436. Fear of the courtroom alone was deemed insufficient. *Id.* at 145, 708 *A*.2d 436.

The panel also held that it was reversible error to admit into evidence that portion of the videotaped interview of T.I. that followed a one-minute break. *Id.* at 146, 708 *A*.2d 436. According to the panel, the "re-interview" was "replete with suggestive material and more akin to cross-examination than the neutral examination [*N.J.R.E.* 803(c)(27) ] requires." *Ibid.*

## II

The State argues that under the facts of this case, the provisions of *N.J.S.A.* 2A:84A–32.4, and the controlling decisional law, permitting T.I. to testify on closed circuit television did not deprive defendant of his constitutional right of confrontation. Defendant maintains that the Appellate Division properly limited the availability of closed circuit television testimony to those instances in which specific findings have been made that the witness will be traumatized by the defendant's presence. Defendant insists that the evidence at trial was ambiguous regarding the determinative cause of T.I.'s fear and that the trial court improperly refused to permit him to waive his right to be present so as to enable T.I. to testify live before the jury.

### -A-

Our analysis must begin with an examination of the facts found by the trial court that informed its decision to allow T.I. to testify on closed circuit television. At the time of trial, T.I. was nine years old. The trial court conducted a pretrial hearing to determine whether T.I. should be permitted to testify on closed circuit television pursuant to *N.J.S.A.* 2A:84A–32.4. That hearing was conducted on June 4, 1996.

T.I. testified at the hearing that she feared talking about the incident and stated that she would not be able to talk about it if defendant was present. T.I. also indicated that she would not be able to testify in court in front of a jury even if defendant was not present.

Next to testify was Jacquelyn Bonanno, a counselor for the Resolve Community Counseling Center, who had been working with T.I. through T.I.'s school. Ms. Bonanno testified that in her opinion, T.I. would be unable to testify either in front of defendant or in front of a jury. She stated that T.I. continually indicated that she was frightened and did not want to go to court. When Ms. Bonanno was asked by the trial judge whether she thought that testifying would be a traumatic event for T.I., Ms. Bonanno said yes.

A.I., T.I.'s mother, testified that a week prior to the hearing T.I. and the assistant prosecutor had come to court to try to acquaint T.I. with the courtroom. A.I. indicated that T.I. refused to sit in the witness chair and refused to talk. A.I. also testified that T.I. was having problems going to school and interacting with other children.

At the close of the evidentiary hearing, the trial court made the following factual findings and legal conclusions:

My view of that child is, A, sure, she is frightened but it's beyond the fear I've seen in other children who have testified in similar cases before me in similar courtrooms as this. I have had other cases involving children of seven, eight, nine, ten and they're all afraid to come into court. But that is overcome in the past at least by them coming in a day or week before and sitting in the [witness] seat.

This child is a very frightened little girl. That fear comes through quite clearly. It comes through also if [T.I.] doesn't want to go on about a question, [T.I.] puts her head down and doesn't say anything and then you have to ask her another question to draw her out.

. . . .

Now clearly from [T.I.] the facts are quite evident. Although she has no trouble sleeping, her mother confirms that fact, she still has a lot of fear of [defendant].

. . . .

It comes through her mother who testified that the little girl is frightened of this gentleman and of the person, Miss Bonanno, who has interviewed the child and talked to the child and acted as her counselor and it is clear that she has fear not only of testifying in this room before 12 or 14 strangers but also of this particular gentleman.

I have written down the following notes on [T.I.], some of which were questions by the State and some of which were mine and some defense questions. She said quite clearly in there she could not testify in person before the jury. That she's scared when she sees the defendant. That she's not able to sit in the witness chair. That because the room is too big and she cannot talk in court. But she could talk about it in camera with the link-up we have set up here.

. . . .

[The child's mother] testified ... that the child has in the last several weeks manifested more problems. She's afraid of him. Whenever she sees him, she gets very angry and fearful and what's very important is that it's manifesting itself in school and that's manifesting itself around the area of the first trial date, which is May 6th continuing through today's date. That's why the school brought in the counselor.

To say that's some coincidence is begging the—is evading the question it seems to me. The child is getting more and more fearful. She is even faking illness not to go to school.

Now, the fact that the mother thought the child could testify in court is not controlling. The expert says that that can't happen. The child says that can't happen. I find based upon the testimony that I've heard quite clearly beyond my mind any doubt, surely by clear and convincing evidence, that this child is frightened of your client and frightened of these surroundings and frightened beyond the normal.

T.I. was scheduled to testify on closed circuit television on June 5, 1996. Before that testimony could begin, T.I. became ill. The assistant prosecutor informed the court that T.I. "has been throwing up." When defense counsel urged the court to disregard the prosecutor's statement that the child's illness was a further indication of her fears of the courtroom, the trial court stated:

I think it's quite clear that it's necessary to protect her welfare as a witness today that she would truly be traumatized if she was required to appear in court before the jury and your client.

I believe that based upon my seeing the child testify yesterday before me and hearing her therapist testify before in open court. This is not mere nervousness or excitement or any reluctance to testify. I have tried similar cases in the past with

other children. None of them enjoy coming in. But I've never seen a child more frightened to come into court than this particular case.

To summarize, the trial court found that T.I. was fearful of testifying in open court and in the presence of defendant, and for those reasons, she needed to testify on closed circuit television.

After the court made its rulings on June 4, 1996, defense counsel informed the trial court for the first time on June 5, 1996, that defendant was "willing to waive his presence and ... sit in another room or outside in the hallway while [T.I.] testifie[d]." The trial court concluded that the child still would be too frightened or traumatized to testify.

The statute that outlines when a child may be permitted to testify out of the presence of the jury provides:

a. In prosecutions for aggravated sexual assault [and] sexual assault ..., the court may, on motion and after conducting a hearing in camera, order the taking of the testimony of a witness on closed circuit television at the trial, out of the view of the jury, defendant, or spectators upon making findings as provided in subsection b. of this section.

b. An order under this section may be made only if the court finds that the witness is 16 years of age or younger and that there is a substantial likelihood that the witness would suffer severe emotional or mental distress if required to testify in open court. The order shall be specific as to whether the witness will testify outside the presence of spectators, the defendant, the jury, or all of them and shall be based on specific findings relating to the impact of the presence of each.

[*N.J.S.A.* 2A:84A–32.4]

It is clear that the trial court made the factual findings required by the statute, and those findings are supported by substantial credible evidence in the record. *State v. Locurto,* 157 *N.J.* 463, 472, 724 *A.*2d 234 (1999); *State v. Johnson,* 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964). Those findings should not be disturbed.

-B-

Although the trial court conducted the evidentiary hearing required by *N.J.S.A.* 2A:84A–32.4 and found that the statutory preconditions for allowing testimony on closed circuit television had been satisfied, defendant nonetheless contends that his constitutional right to confrontation was violated. The Confrontation Clause of the Sixth Amendment of the United States Constitution

provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Confrontation Clause is applicable to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 *U.S.* 400, 85 *S.Ct.* 1065, 13 *L.Ed.*2d 923 (1965).

In *Mattox v. United States*, the first case interpreting the Confrontation Clause, the United States Supreme Court noted:

> The primary object of the [Confrontation Clause] was to prevent depositions or ex parte affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.
>
> [*Mattox v. United States*, 156 *U.S.* 237, 242–43, 15 *S.Ct.* 337, 339, 39 *L.Ed.* 409 (1895) ]

■ Although the constitutional right to confrontation is firmly entrenched in American jurisprudence, the right is not absolute. *Craig, supra*, 497 *U.S.* at 844, 110 *S.Ct.* at 3163, 111 *L.Ed.*2d at 677. Both the United States Supreme Court and this Court have held that the right is subject to certain exceptions of consequence. *Id.* at 857, 110 *S.Ct.* at 3170, 111 *L.Ed.*2d at 686 (using closed circuit television testimony does not violate Confrontation Clause where child witness fears defendant); *Idaho v. Wright*, 497 *U.S.* 805, 110 *S.Ct.* 3139, 111 *L.Ed.*2d 638 (1990) (admitting hearsay statements into evidence does not violate Confrontation Clause when statements have sufficient indicia of reliability); *Coy v. Iowa*, 487 *U.S.* 1012, 108 *S.Ct.* 2798, 101 *L.Ed.*2d 857 (1988) (holding an exception to Confrontation Clause must further important public policy); *Pennsylvania v. Ritchie*, 480 *U.S.* 39, 107 *S.Ct.* 989, 94 *L.Ed.*2d 40 (1987) (determining that Confrontation Clause does not compel pre-trial discovery); *Bourjaily v. United States*, 483 *U.S.* 171, 107 *S.Ct.* 2775, 97 *L.Ed.*2d 144 (1987) (holding co-conspirator hearsay exception does not violate Confrontation Clause); *United States v. Inadi*, 475 *U.S.* 387, 106 *S.Ct.* 1121, 89 *L.Ed.*2d 390 (1986) (same); *Ohio v. Roberts*, 448 *U.S.* 56, 100 *S.Ct.* 2531, 65 *L.Ed.*2d 597 (1980) (stating demonstration of unavailabili-

ty of witness is not necessary prerequisite to admission of certain hearsay to avoid violation of Confrontation Clause); *California v. Green*, 399 *U.S.* 149, 90 *S.Ct.* 1930, 26 *L.Ed.*2d 489 (1970) (holding prior statement subject to cross-examination when made does not violate Confrontation Clause); *Crandall, supra*, 120 *N.J.* 649, 577 *A.*2d 483 (holding child's closed circuit television testimony does not violate Confrontation Clause where child witness fears defendant).

The basic elements of confrontation are physical presence, oath, cross-examination, and observation of demeanor by the trier of fact. *Craig, supra*, 497 *U.S.* at 846, 110 *S.Ct.* at 3163, 111 *L.Ed.*2d at 678. However, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* at 845, 110 *S.Ct.* at 3163, 111 *L.Ed.*2d at 678.

The trial court determined that T.I.'s abnormal fear of testifying both in the presence of defendant and the jury required the use of closed circuit television. In reversing, the Appellate Division interpreted *Craig* and *Crandall* as establishing "that testimony by closed circuit television may only be employed to protect the infant from a face-to-face confrontation with the defendant." *Smith, supra*, 310 *N.J.Super.* at 144–45, 708 *A.*2d 436 (citing *Craig, supra*, 497 *U.S.* at 856, 110 *S.Ct.* at 3169, 111 *L.Ed.*2d at 685; *Crandall, supra*, 120 *N.J.* at 655, 577 *A.*2d 483.) The court held that because defendant was willing to waive his presence, use of closed circuit television was a "clear violation of the principles pronounced in *Craig* and *Crandall*," requiring a reversal of the conviction. *Id.* at 145, 708 *A.*2d 436.

We disagree that either *Craig* or *Crandall* required a reversal in this case. To the contrary, the *Craig* and *Crandall* decisions provide the logical framework and reasoned foundation on which an affirmance of the trial court's rulings should have been premised.

The protection of children from undue trauma associated with testifying is an important public policy goal. *Coy, supra,* 487 *U.S.* at 1025, 108 *S.Ct.* at 2805, 101 *L.Ed.*2d at 869 (O'Connor, J., concurring). Clearly, that is the public policy sought to be advanced by *N.J.S.A.* 2A:84A–32.4. With the caveat of *Mattox* firmly in mind, the *Craig* Court held that considerations of public policy can trump the preference for face-to-face confrontation in a case in which a child witness will be unduly traumatized by the presence of the defendant. *Craig, supra,* 497 *U.S.* at 853, 110 *S.Ct.* at 3167, 111 *L.Ed.*2d at 683. Here, as in *Craig,* "where face-to-face confrontation causes significant emotional distress in a child witness, there is evidence that such confrontation would in fact *disserve* the Confrontation Clause's truth-seeking goal." *Id.* at 857, 110 *S.Ct.* at 3169, 111 *L.Ed.*2d at 686. The record before us establishes that face-to-face confrontation between T.I. and defendant, and/or between T.I. and the jury, "may so overwhelm the child as to prevent the possibility of effective testimony, thereby undermining the truth-finding function of the trial itself." *Coy, supra,* 487 *U.S.* at 1032, 108 *S.Ct.* at 2809, 101 *L.Ed.*2d at 874 (Blackmun, J., dissenting). The trial court's factual findings and well-reasoned opinion were intended to preclude that from occurring.

We reject the Appellate Division's attempt to limit application of *N.J.S.A.* 2A:84A–32.4 to only those instances in which the child's incapacitating fear is derived solely from the presence of the defendant. Here, there is no clear way to differentiate among the origins of T.I.'s fears. Whether her fear was attributable to defendant, or resulted from a combination of testifying in the courtroom in the presence of defendant cannot be discerned. Defendant did not agree to waive his presence until attempts had been made to prepare the victim to testify in defendant's presence. By the time he offered to waive his presence on June 5, 1996, the traumatic effect had already undermined the truth-seeking function of the trial. A week before trial, the child demonstrated her fears when a courtroom rehearsal was attempted. Such fears by a nine-year-old sexual assault victim should not be allowed to sub-

vert the truth which in turn frustrates the underlying truth-seeking principles of the Confrontation Clause.

The more reasoned approach is to look at the result of the fear, not simply its origin. If the effect of the child's fear is to prevent the proper functioning of the truth-finding process, whether that fear derives from the presence of the defendant alone, or a combination of the presence of the defendant and the jury, or from the courtroom, should not lead to a different result under *N.J.S.A.* 2A:84A–32.4 or the Confrontation Clause. Moreover, in a typical busy courthouse, it is impractical to seek a smaller courtroom in an attempt to possibly reduce the child-victim's fear, particularly when the child is so afraid that the attempt is not likely to succeed.

Here, as in *Craig,* the testimony on closed circuit television was under oath, an extensive cross-examination was conducted, and the jury and defendant made observations of T.I.'s demeanor that "adequately ensure[d] that the testimony [was] both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Craig, supra,* 497 *U.S.* at 851, 110 *S.Ct.* at 3166, 111 *L.Ed.*2d at 682. It must be remembered that "the ultimate purpose of the Confrontation Clause is not to protect eye-to-eye contact between the jury and witness" but instead "to further the truth-seeking process of the trial by ensuring that the jury can observe the demeanor of the witness." *Crandall, supra,* 120 *N.J.* at 658, 577 *A.*2d 483. Under the facts and circumstances of this case, it cannot be said that the use of closed circuit television deprived defendant of his right to confrontation. Consequently, we hold that the trial court did not err in permitting T.I. to testify on closed circuit television.

### III

The State also argues that the videotaped statement given by T.I. was properly admitted as evidence. Pursuant to *New Jersey Rule of Evidence* 104, the trial court conducted a preliminary hearing to determine the admissibility of that statement.

During that hearing Detective Edward R. Koenig, an experienced detective in the Union County Prosecutor's Office, Child Abuse Unit, testified that the videotape encompassed his entire conversation with T.I., except for his introduction to her. The videotape reveals that during the interview, the detective asked T.I. a number of questions about the incident, using an anatomically-correct doll to permit T.I. to demonstrate the assault. A break was taken during the interview to allow Detective Koenig to confer with a "spotting" detective to determine whether he had overlooked any topics while questioning T.I. The break lasted approximately one minute and was not recorded on the videotape. The detective then continued with follow-up questions for T.I. The trial court observed that although some of the questions that followed the break were repetitive, they were not unduly suggestive. Nonetheless, the court waited until after hearing T.I.'s trial testimony before deciding whether to admit the videotape as evidence. After hearing T.I.'s trial testimony, the trial court concluded that the videotape was admissible, finding it trustworthy and reliable.

The Appellate Division agreed with the trial court's determination regarding that portion of the interview that preceded the one-minute break. *Smith, supra,* 310 *N.J.Super.* at 146, 708 *A.*2d 436. However, the panel held that subsequent to the one-minute break, the "'re-interview' was replete with suggestive material and more akin to cross-examination." *Ibid.* According to the panel, "[s]uggestive questions may not imperil voluntariness, but a lack of spontaneity creates doubts as to reliability." *Id.* at 146–47, 708 *A.*2d 436. It found reversible error in admitting the entire videotape.

T.I.'s videotaped statement was admitted as evidence pursuant to *New Jersey Rule of Evidence* 803(c)(27). The genesis of the tender years exception to the hearsay rule, *N.J.R.E.* 803(c)(27), can be traced to the Court's decision in *State v. D.R.,* 109 *N.J.* 348, 537 *A.*2d 667 (1988), which recognized the difficult problems of proof associated with child-victim testimony in sexual abuse prose-

cutions. In *State v. D.R.*, we observed that "testimony by the victim is often the indispensable element of the prosecution's case." *Id.* at 358, 537 *A.2d* 667. As in many cases, the Court noted, acts of child sexual abuse are perpetrated by an individual close to the victim, unwitnessed, and leave no visible physical evidence. *Ibid.* We also noted that testimony by the child is often "highly credible" as the offensiveness and invasive nature of the attack can be blunted by the child's lack of sexual orientation, thereby producing an uninhibited ability of the child to recount the assaultive acts. *Id.* at 359, 537 *A.2d* 667.

Consistent with *State v. D.R.*, *Idaho v. Wright* held that before a young victim's incriminating hearsay statements can be presented as evidence, the statements must bear sufficient indicia of reliability. *Wright, supra,* 497 *U.S.* at 816, 110 *S.Ct.* at 3147, 111 *L.Ed.*2d at 653. More recently, we reaffirmed that *New Jersey Rule of Evidence* 803(c)(27) requires a trial court to make a preliminary finding that an out-of-court statement is sufficiently reliable based on the "time, content and circumstances of the statement and then decide what is the probability that the statement is trustworthy." *State v. D.G.*, 157 *N.J.* 112, 128, 723 *A.2d* 588 (1999). That rule was meticulously followed in this case.

The trial court waited until after the child had given her trial testimony to enable it to make a comparison before making its ruling. In so doing, the trial court was able to compare key factors such as the spontaneity and consistency of the child's responses to questions and the language or terminology used by the child. *See State v. Michaels,* 136 *N.J.* 299, 318, 642 *A.2d* 1372 (1994). The eight-year-old child here was videotaped only three days after the incident. Although T.I. was obviously uncomfortable and reticent in answering the detective's questions, her answers were consistent and she used unadulterated terminology in recounting the events of the assault. T.I. exhibited a clear understanding of the difference between telling the truth and telling a lie, and no evidence was produced that would indicate that T.I. had any motive to fabricate the charges. To the con-

trary, her statement was made despite the very real fear of alienating her aunt, A.T., defendant's fiancee.

In addition, Detective Koenig testified that other than introducing himself to T.I., there was no other discussion between himself and T.I. concerning the facts of the assault apart from that which was videotaped. The circumstances surrounding the questioning were unimposing and in no way unduly stilted or biased against defendant. Furthermore, we do not perceive the use of the anatomically-correct doll as undermining the reliability of T.I.'s statement.

■ Although some of the questions asked by Detective Koenig could be deemed to be slightly leading in nature, we disagree with the Appellate Division that the questions were unduly suggestive "and akin to cross-examination." Indeed, the use of leading questions to facilitate an examination of child witnesses who are hesitant, evasive or reluctant is not improper. *In re R.R.*, 79 *N.J.* 97, 114–15, 398 *A.*2d 76 (1979); *In re B.G.*, 289 *N.J.Super.* 361, 370–71, 674 *A.*2d 178 (App.Div.), *certif. denied,* 145 *N.J.* 374, 678 *A.*2d 714 (1996); *United States v. Nabors,* 762 *F.*2d 642, 650–51 (8th Cir.1985); *United States v. Littlewind,* 551 *F.*2d 244, 245 (8th Cir.1977).

The facts in the present case are to be distinguished from those in *State v. D.G.,* which failed to establish sufficient reliability. There, the eight-year-old victim was persistently questioned on videotape by a detective from the Cape May County Prosecutor's office. The seven minutes of questioning that occurred while the detective spoke with the child's aunt and asked her to reassure the little girl that it was permissible to tell the truth, went too far. The totality of what transpired during the seven-minute break persuaded the Court that the detective's questioning was not "a neutral interview designed to provide [the child] with a fair opportunity to describe what happened." *State v. D.G., supra,* 157 *N.J.* at 131, 723 *A.*2d 588. The combination of the detective's questioning and the seven-minute gap in the interview, during which time the detective and the witness's aunt spoke to the child

and encouraged her to tell the truth, combined "to call into question the validity of the second part of the interview." *Id.* at 133, 723 *A.*2d 588. In both cases, the ultimate issue is whether the hearsay is sufficiently reliable and that answer is highly fact-sensitive.

Based on the totality of the circumstances in the present case, the videotaped statement of T.I. is more than sufficiently reliable to satisfy the trustworthiness required by *New Jersey Rule of Evidence* 803(c)(27). We caution, however, that the trial courts in a proper case must serve as gatekeepers when repetitive corroborating hearsay evidence is proffered pursuant to *New Jersey Rule of Evidence* 803(c)(27). Consequently, "a trial court should be cognizant of its right under *N.J.R.E.* 403, to exclude evidence if it finds in its discretion, that the prejudicial value of that evidence substantially outweighs its probative value." *State v. D.G., supra,* 157 *N.J.* at 128, 723 *A.*2d 588.

## IV

The judgment of the Appellate Division is reversed. The matter is remanded to the Appellate Division to decide the remaining issues raised but not resolved in that court.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—none.