# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4238-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DAVID RAMIREZ,

     Defendant-Appellant.

_____

Submitted November 14, 2019 – Decided February 27, 2020

Before Judges Whipple and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-04-0537.

Joseph E. Krakora, Public Defender, attorney for appellant (Zachary Gilbert Markarian, Assistant Deputy Public Defender, of counsel and on the brief).

Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney for respondent (David Michael Liston, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from a March 19, 2018 judgment of conviction for second-degree sexual assault, N.J.S.A. 2C:14-2(b) and second-degree endangering, N.J.S.A. 2C:24-4(a)(1), after a jury trial.

Defendant raises the following arguments.

> POINT I: THE ADMISSION OF REPETITIVE, CORROBORATIVE HEARSAY STATEMENTS PURSUANT TO THE TENDER-YEARS EXCEPTION WAS UNDULY PREJUDICIAL AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

> POINT 2: DEFENDANT WAS DEPRIVED OF A FAIR TRIAL BY PERVASIVE MISCONDUCT IN OPENING AND SUMMATION, WHEREBY THE PROSECUTOR VOUCHED FOR THE CREDIBILITY OF THE COMPLAINING WITNESS, ASKED JURORS NOT TO HOLD INVESTIGATORS' FAILURE TO SPEAK TO A KEY WITNESS AGAINST THE COMPLAINING WITNESS, AND OFFERED UNSUPPORTED TESTIMONY ABOUT WHY OFFICERS FAILED TO PERFORM DNA TESTING. (Partially raised below.)

>> A.    The Prosecutor Encouraged the Jury to Give Extra Weight to D.O.'s [1] Testimony by Referring to Video Footage of Her Interview and D.O.'s Trial Testimony as Two Separate Witnesses, Vouching for Her Credibility, and Repeatedly Stating that "No Reasonable Person" Could Find She Was Not Credible.

---

[1]  We use initials to protect the identity of the child victim.

　　　　B.　Referring to Investigators' Failure to Speak to D.O.'s Sister, the Prosecutor Asked Jurors Not to "Hold That Against" D.O. in Their Evaluation of the Evidence.

　　　　C.　The Prosecutor in Summation Improperly Testified About Why Investigators Had Not Attempted DNA Testing.

　　　　POINT 3: A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE JUDGE DOUBLE-COUNTED AND ERRED IN FINDING AND WEIGHING AGGRAVATING AND MITIGATING FACTORS.

We reject these arguments and affirm.

We glean the following facts from the record. On July 3, 2015, defendant lived with then-eleven-year-old D.O., D.O.'s mother, and three-year-old I.R., the daughter he shared with D.O.'s mother. Although D.O.'s mother was not married to defendant, D.O. referred to him as her step-father. On that day, D.O., defendant, I.R., and D.O.'s mother were in the one-bedroom apartment they shared. They had planned a family outing to an aquarium or waterpark, but defendant told them they could not go.

While D.O.'s mother was washing clothes in the bathroom and I.R. was sitting on the couch in the living room occupied with a game on her phone, D.O. was sitting on the living room floor doing schoolwork on the coffee table in front of the couch. When D.O. asked defendant for help, he sat behind her on

A-4238-17T4

the couch and began massaging her shoulders, and then grabbed her breasts both over and under her shirt. When defendant "ma[d]e his way towards" D.O.'s pants, she stopped him. After D.O.'s mother came into the living room and saw D.O. crying, she asked D.O. what was wrong, to which D.O. responded she was having trouble with a math problem. D.O.'s mother noticed that the neck of D.O.'s shirt was "stretched out." D.O.'s mother went into the kitchen, D.O. followed her, and her mother asked her again what happened; D.O. then told her that defendant touched her. D.O.'s mother confronted defendant, after which defendant threatened to jump out the fourth-story window.

D.O., her mother, and I.R. then left the apartment, called the police, and met them in the lobby. At police headquarters, D.O. reported defendant touched her inappropriately on multiple occasions beginning earlier that year, usually at home and while her mother and I.R. were in the apartment. On the prior occasions, defendant touched D.O.'s breasts over and under her clothing after coming up behind her while she was occupied with other tasks. D.O. stated she did not tell her mother when this happened because her mother loved defendant and D.O. did not want to see her mother hurt.

That same day, Detective Joseph Chesseri, who was trained in "Finding Words," a protocol for interviewing children "in a non-leading, non-suggestive

way," was called in by Detective William Coleman from the Middlesex County Prosecutor's Office to interview D.O. The interview with D.O. was video-recorded. Defendant was subsequently indicted for second-degree sexual assault and second-degree endangering the welfare of a child.

The prosecutor moved to admit the video-recording of the interview, as well as D.O.'s mother's testimony about D.O.'s statements to her, under 1) the fresh complaint exception to the hearsay rule, which allows out-of-court statements by a sexual assault victim to show the victim did complain, and 2) N.J.R.E. 803(c)(27), which allows out-of-court statements made by a child under the age of twelve to be admitted in cases involving sexual misconduct against that child.

After conducting a hearing, the trial judge granted the prosecutor's motion. As to the fresh complaint exception to the hearsay rule for the statements D.O. made to her mother, the trial judge considered the Hill and Bethune [2] requirements: 1) whether the victim's statement was made to a person she would ordinarily turn to for support, 2) whether the statement was made within a reasonable time after the alleged sexual assault, and 3) whether the statement

---

[2] State v. Hill, 121 N.J. 150, 163, 167 (1990); see also State v. Bethune, 121 N.J. 137, 148-49 (1990).

A-4238-17T4

was made spontaneously and voluntarily. The trial judge also weighed the <u>Hill</u> and <u>Bethune</u>[3] factors to determine whether the statement was spontaneous and voluntary: 1) the age of the victim, 2) the circumstances under which the interrogation takes place, 3) the victim's relationship with the interrogator, 4) who initiated the discussion, and 5) the type of questions asked.

The trial judge found the prosecutor met all the required criteria for admitting the testimony of a fresh complaint witness in that it was "undeniably clear" that D.O. revealed the sexual abuse to someone she would ordinarily turn to for support – her mother. Although the trial judge noted there is no case law "that strictly defines what constitutes a 'reasonable time'" after the abuse for purposes of the fresh complaint rule, she found that the approximately twenty-three minutes was reasonable, given defendant was sitting near D.O. the first time D.O.'s mother questioned her, and D.O.'s ultimate revelation to her mother occurred within a half hour. The trial judge further found the statement voluntary and spontaneous in that D.O. went to her mother of her own accord and told her mother about the assault after her mother asked an open-ended question. Thus, having met all the requirements under <u>Hill</u> and <u>Bethune</u>, the

---

[3] <u>Id.</u> at 168 (citing <u>Bethune</u>, 121 N.J. at 145).

trial judge found D.O.'s statements to her mother admissible under the fresh complaint rule.

As to the admissibility of D.O.'s statements to her mother and the video-recorded interview with Chesseri under the "tender years exception" to the hearsay rule, N.J.R.E. 803(c)(27), the trial judge noted that because D.O. was less than twelve years old at the time she made the statements to her mother and Chesseri, and because the prosecutor put defendant on notice of his intention to introduce the out-of-court statements and to call D.O. as a witness at trial, the only issue for the trial judge to determine was "whether, based on the time, content, and circumstances of D.O.'s statements, there is a probability that the statements are trustworthy."

Citing State v. R.M., the trial judge considered the totality of the circumstances surrounding the statements to determine their trustworthiness.[4] Considering the factors set out in Idaho v. Wright 497 U.S. 805, 821-22 (1990), the trial judge found D.O.'s statements to her mother and Chesseri contained significant indicia of reliability and were trustworthy and reliable. The trial judge found D.O.'s mother's questions were not coercive, as D.O. voluntarily followed her mother into the kitchen and told her mother about the incident in

---

[4] State v. R.M., 245 N.J. Super. 504, 517-18 (App. Div. 1991).

response to the open-ended question of what was wrong. The trial judge noted D.O.'s mother did not ask anything about defendant and whether he had touched D.O. or otherwise mistreated her, and that further, D.O.'s description to her mother of the way defendant touched her was consistent with D.O.'s later description to Chesseri. The trial judge also found no evidence of, nor did defense counsel assert, that D.O. had a preconceived aversion to defendant or a motive to lie. The trial judge lastly found D.O.'s description of defendant's touching used "words within the ken of the average child of her age" that belied any suggestion D.O. was coached into her statement.

As to the video-recorded interview, the trial judge found Chesseri "was careful to ask D.O. open-ended questions, to which D.O. gave age-appropriate," spontaneous, highly descriptive responses describing the incident, which were consistent and used language one would expect of an eleven-year-old.

The trial judge found defense counsel's argument regarding D.O.'s proximity in age to the cutoff age for the rule was meritless, as 803(c)(27) is a "bright-line rule for admitting the statements of child victims who are under the age of twelve." She further found Chesseri's role as an investigator did not negate the reliability of D.O.'s statements, in that he asked predominately open-ended questions in accordance with his training in the Finding Words program.

Based on these findings, the trial judge found 1) D.O.'s statement to her mother admissible under the fresh complaint exception to the bar against hearsay, and 2) D.O.'s statements to her mother and Chesseri (in the video-recorded interview) admissible under N.J.R.E. 803(c)(27), and granted the prosecutor's motion. The same judge presided over a jury trial that began in November 2017.

In his opening statement, the prosecutor referenced the evidence and testimony the jury would hear during trial. When he spoke about the witnesses the jury would see, he told them:

> Obviously, you're going to hear from the people who were involved. In a few moments, [D.O.] is going to come in and tell you that she was abused by the defendant. Her mother . . . will come in and talk about what happened. . . .
>
> . . . .
>
> You will . . . see and hear . . . the interview that was conducted with [D.O.] back on July . . . 3[,] . . . 2015 at the Middlesex County Prosecutor's Office.
>
> Now, in most instances . . . you don't see a recorded interview of a witness. But the law does allow in certain circumstances, this being one of them, that the interview of a child under [twelve] is able to be played because the law understands that as . . . children grow, that time passes between the event and the day that they come into court.

9

A-4238-17T4

[Y]ou not only get [D.O.] as she is today. You will be able to see and hear the child as she was on the day that she revealed this to her mother and ultimately to law enforcement.

So, in a sense, we have six witnesses, because you'll see the [fourteen]-year-old [D.O.] of 2017 and you'll see her as the [eleven]-year-old she was on July 3, 2015.

The prosecutor then told the jury that when they looked at defendant

the law says that you're looking at an innocent man. And that only changes if the State is able to prove its case beyond a reasonable doubt. . . .

. . . .

We have to leave you firmly convinced. And in our effort to do that, we are going to rely heavily, most importantly, on the testimony of a [fourteen]-year-old girl and her [eleven]-year-old self, as we said before, at the time that all of this was revealed to . . . her mother and to the police.

Defense counsel told the jury that while police officers would be testifying,

you're not going to hear that there's any DNA evidence in this case. And you're not going to hear that anybody even tried to get any DNA evidence. You're going to hear that no photographs were taken in this case of the setup of the living room of the apartment and that no one even tried to do that. . . .

That's what I expect you're going to hear. So, what are you left with? What you're left with is two

people, [D.O.] and her mother, just what they said. What . . . [D.O.] said happened, what [D.O.]'s mother said that [D.O.] said happened, and you may hear what [D.O.]'s mother says that [defendant] said.

So, that's just two people. And in holding the State to its enormous responsibility to prove to you beyond a reasonable doubt the charges in this case, that's . . . all you've got is the two people.

At trial, D.O., testified as to the July 3 incident as well as to the prior incidents. D.O.'s mother also testified as to the events of July 3. Officer Coleman testified that as a detective with the juvenile bureau he was notified of D.O. and her mother's transport to the station, and that because he was "not forensically trained to speak with [eleven]-year-old victims . . . as procedure" he notified the prosecutor's office to do the forensic interview. That was when Chesseri was called in, as Coleman testified that where there is a victim less than twelve years old, "I don't generally ask them questions because of their age. It has to be done forensically."

Chesseri then testified as to his interview with D.O., stating the interview room is "geared towards a set-up for children," that he "had been trained with the forensic interviewing of children" in 2009 and 2014, and that he had conducted those types of interviews in Hudson and Middlesex Counties over the course of six years in the Special Victims Unit. Chesseri described the interview

process as "a non-leading, . . . non-suggestive . . . interviewing process to make them comfortable in the setting," and that while there was a structure to it, when a child began telling him what happened he would let them talk. The protocol was to build rapport with the child, discuss the concept of telling the truth, have the child name body parts using diagrams of males and females, and explore details if the child made a disclosure. Chesseri testified there was no requirement the interview result in a disclosure, but that D.O. did disclose during her interview that defendant had touched her on her breasts under her clothing.

The trial judge then played the video-recorded interview for the jury. In the video, Chesseri told D.O. she could say anything she wanted, that she was not in trouble with him, but the "only rule that I have when you talk is that everything that we talk about has to be the truth. And the truth is what really happened, okay? Do you promise to tell me the truth?" D.O. responded in the affirmative. He also told her it was important she correct him if he got something wrong, and to stop him if she did not understand anything. After discussing summer plans and books, Chesseri asked D.O. if she knew why she was there, to which she responded "[b]ecause my step-dad tried to touch me." After Chesseri stopped her to make sure they were on the same page with naming body parts, D.O. told him, in response to Chesseri's questions, that defendant

12

touched her breasts, that he had done so before, that he tried to touch her genital area but that she pushed him away, and that defendant had touched her breasts on other occasions.

Defendant chose to exercise his right to remain silent. Defense moved for acquittal on the evidence presented, submitting the evidence was insufficient as a matter of law due to lack of any physical evidence and lack of any attempt to obtain physical evidence. In denying the motion, the trial judge noted it was not necessary the testimony be corroborated; that it would not be expected in this matter to find physical evidence, as there was no penetration or kissing; and that the word of the victim in this case was sufficient if the jury chose to believe her, in that it was detailed, specific, and consistent with her mother's testimony and her prior testimony.

During summation, the prosecutor told the jury he would "address . . . testimony that you've heard that supports a conviction here. We will address hopefully all the things that [defense counsel] asked you to consider because most of the things that she has asked you to consider you should consider and reject almost immediately." The prosecutor noted that while at the outset the jurors all took a neutral position as to whether they thought a child was more or less likely to be honest when testifying

now, at the end of the case, [w]e're asking that question about the credibility of . . . this specific child, [D.O.] . . . the [fourteen]-year-old [D.O.] who came in here yesterday and took an oath on the Bible and made a promise to tell the truth. . . . But beyond that, we're asking did [eleven]-year-old [D.O.], when she finally disclosed to her mother what the defendant had been doing to her, was she telling the truth then? Because that was another instance where she told somebody what was happening to her. Later that same day, going back two years, the [eleven]-year old [D.O.] told . . . Chesseri . . . this is what has been going on . . . [w]as she telling the truth then? . . . Now we are focused on one child who I think you've had an opportunity to look at and listen to both in person and on video.

I start with that point . . . because credibility is really the central issue . . . of your deliberations here. Because if the facts in the case are determined to be true, then no reasonable person is going to say even though . . . an adult male touched the breasts of an [eleven]-year-old, I don't think that's a crime because that's not sexual assault. . . . [N]o reasonable person is going to say that even though I believe everything [D.O.] said, I don't believe that her morals were endangered . . . .

. . . .

So, central, important question is [D.O.] being honest? . . . Truthful testimony, by nature, by definition, is limited testimony . . . [b]ecause if you're committed to telling the truth, you're . . . limited by reality. That's not true when you're lying . . . if [lying is] your intention, you're not bound by anything . . . when you say something like he touched my breasts and then he moved towards my pants but he didn't pull [them] down, well, if you're lying about that, if you

14

wanted to create the misimpression that this person was
. . . committing a terrible sexual assault, there's nothing
to stop you from saying, you know, he got his hands in
my pants . . . that's not to diminish what [D.O.] actually
said. The point is she actually could have said a lot
more in the effort to lie if that's what she was doing.

If you take the oath seriously . . . you're not going
to say things that didn't happen even if it doesn't
necessarily help your cause . . . the defense is saying
she's not telling the truth.

In response to defense counsel's assertion that D.O. was angry with
defendant because he told her they could not go to an aquarium or water park,
the prosecutor told the jury

do you honestly think that she would say these things
against this man simply because she wasn't able to go
on a summer outing? . . . No reasonable person is going
to see that in her. You didn't see it yesterday when she
testified. You didn't see it in the video when she told
[]Chesseri . . . [defendant] said no. The tone of voice
that she used, there was no anger in it. There was no
frustration in it. She said matter-of-factly like it's just
something that happened . . . [d]oes anyone honestly
think that even if she was upset about [defendant] . . .
ruining the plans . . . she would keep that anger for two
years and . . . continue the same lie about it? . . . [I]n
assessing the credibility of the witness, [D.O.], a
reasonable person can't find any motivation for her to
say these things unless they are actually true.

As to defense counsel pointing out that no one took photos of the couch
or the apartment, the prosecutor remarked

[i]f a juror, in this case, needed a photograph of a sofa to make a determination about this girl's inherent credibility, then I'd suggest to you that you're not a reasonable person . . . [the lack of photographs] is really an inconsequential or unimportant point.

In response to defense counsel's assertion there was a discrepancy between D.O.'s video-recorded testimony and trial testimony, the prosecutor told the jury

[t]he [S]tate would characterize it as a very truthful and descriptive piece of testimony. Now, she forgot about the fact that after [defendant] touched her breasts, he got up . . . left the room . . . came back . . . once it was brought to her attention, she acknowledged [it] . . . [t]hat's what an honest person does, isn't it?

The prosecutor again noted that D.O.'s testimony was

always consistent . . . [s]he never once said he touched anywhere else . . . [a]nd she could have . . . [i]f you are lying . . . you are not bound to the truth . . . you can say anything . . . [t]here's nothing to stop her from saying that he touched my vagina . . . [b]ut she didn't say that because it didn't happen . . . [t]he reason why she didn't is knowable; it's clear; it's obvious. She didn't say that because it didn't happen. What she's telling you, what she's been saying all along . . . is the truth.

Finally, the prosecutor told the jury

[t]he ultimate question here . . . is did [D.O.] tell the truth . . . [t]he only reasonable answer to that question, the only reasonable conclusion that can be drawn from that testimony is yes, she did . . . if she was telling the truth yesterday, then there is no reason to doubt her back on July 3 . . ., 2015.

A-4238-17T4

At that point, defense counsel objected, arguing the prosecutor's remarks about D.O. constituted vouching for her credibility. The prosecutor then finished summation by stating "[t]he only conclusion that can be drawn by a reasonable person based upon what [D.O.] said in court and back when she disclosed what happened to her, [is] that she was telling the truth. And because she's telling the truth, the defendant is guilty of the crimes [for which he has been] indicted."

The trial judge instructed the jury, including the fresh complaint jury instruction, and the jury found defendant guilty on both counts. The pre-sentence report (PSR) noted that defendant underwent an evaluation at the Avenel Diagnostic Treatment Center (Avenel). The evaluation found defendant's

> behavior meets the criteria for repetition but not for
> compulsion . . . there are several sexually abusive acts
> on several occasions, which provides clear evidence of
> repetition. . . .

At sentencing, defense counsel asked the trial judge to find mitigating factor seven, as defendant had no prior criminal offenses. The prosecutor argued for aggravating factor nine, both specific and general deterrence, as well as aggravating factor three, the risk that defendant will commit another offense. After considering the PSR, the letters defendant submitted in support of his

17

character, and the arguments by defense counsel and the prosecutor, the trial judge found aggravating factor three, the risk defendant will commit another offense "given that this was not an isolated incident . . . and [the Avenel evaluator] found [defendant's] conduct is repetitive." She went on to state that she found "a very strong factor [nine], the need to deter the defendant and others from violating the law. This [c]ourt and society take sexual offenses against children very seriously. And I send a strong message to this defendant and others that there are serious consequences for such behavior." The trial judge did find mitigating factor seven, but found the aggravating factors outweighed the mitigating. Defendant was sentenced to seven years subject to the No Early Release Act, for count one, and to a five-year concurrent sentence for count two. Defendant was also subject to conditions of: parole supervision for life; reporting and registration conditions of Megan's Law; and was to have no contact with the victim or her mother.

I.

We reject defendant's argument that in the absence of any physical or forensic evidence, confession, or other eyewitness testimony, "[t]he repeated admission of D.O.'s allegations in different formats was unnecessary,

cumulative, and unduly prejudicial" under N.J.R.E. 403 and denied defendant a fair trial under both the United States and New Jersey Constitutions.

A trial judge has "broad discretion in determining whether or not to admit evidence alleged to be relevant and has, as well, broad discretion in determining that even relevant evidence should be excluded if its probative value is outweighed by undue prejudice or undue delay." State v. E.B., 348 N.J. Super. 336, 344 (App. Div. 2002) (citing N.J.R.E. 403). Therefore, the trial judge's evidence ruling is "entitled to deference unless it is a clear error of judgment or so wide of the mark that a manifest denial of justice results." Ibid. N.J.R.E. 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." The presumption is that relevant evidence will be admitted, and for relevant evidence to be properly excluded, "factors favoring exclusion must substantially outweigh the probative value of the contested evidence." E.B., 348 N.J. Super. at 345.

Under the fresh complaint exception to the rule against hearsay, an out-of-court statement by a sexual assault victim is permitted for the purpose of "negat[ing] any inference that because the victim had failed to tell anyone that

she had been [sexually assaulted], her later assertion of [sexual assault] could not be believed." State v. Hill, 121 N.J. 150, 159 (1990) (citation omitted). However, to prevent undue prejudice against the defendant, a fresh complaint statement must have been made within a reasonable time after the assault and must have been spontaneous and voluntary. Id. at 163 (first citing State v. Tirone, 64 N.J. 222, 226-27 (1974); and then citing State v. Balles, 47 N.J. 331, 338-39 (1966)). The statement must also have been made to a person the victim would ordinarily turn to for support. State v. R.K., 220 N.J. 444, 455 (2015) (citations omitted). Because the New Jersey Supreme Court has recognized a child may be too frightened or embarrassed to talk about sexual abuse they have experienced, "[t]hese requirements are relaxed when they are applied to juvenile victims," to allow them additional time to complain. Ibid. (citation omitted).

In cases involving children, statements made in response to a "yes or no" question are not permitted, State v. Bethune, 121 N.J. 137, 145 (1990), but "general, non-coercive questions do not rob a complaint of its admissibility under the fresh-complaint rule," id. at 144 (citations omitted). It is the trial court's role to determine the degree of coercion involved and whether the statement was spontaneous or made directly in response to interrogation, and the court must make its determinations by considering the age of the child, the

child's relationship with the interviewer, the circumstances surrounding the questioning, whether the child initiated the discussion, whether the questions were leading, and the specificity of the questions as it relates to the alleged abuser and alleged acts.  Id. at 145.  When a fresh complaint statement is found admissible, it is so only for the purpose of proving the victim complained, not to corroborate details of the testimony, id. at 146, and jury instructions should be given to inform jurors the purpose of the fresh complaint is to neutralize the inference that the alleged victim's behavior was not consistent with a sexual abuse claim, id. at 147-48.  "Only the facts that are minimally necessary to identify the subject matter of the complaint should be admitted."  R.K., 220 N.J. at 456.

Here, D.O. made the fresh complaint statement to her mother, with whom she had a close relationship, within the half hour, in response to her mother's general question asking why D.O. was crying, which is proper under Bethune. The trial judge considered these factors when she made her determination that the fresh complaint statement was admissible, and thus did not abuse her discretion when admitting D.O.'s mother's testimony as to D.O.'s out-of-court statements, under the fresh complaint exception, to show D.O. did complain to someone soon after the incident.

The "tender years" exception to the hearsay rule, N.J.R.E. 803(c)(27), was created when the New Jersey Supreme Court recognized the "difficult problems of proof" regarding child-victim testimony in sexual abuse prosecutions, where the victim's testimony "is often the indispensable element of the prosecution's case." State v. Smith, 158 N.J. 376, 388-89 (1999) (quoting State v. D.R., 109 N.J. 348, 358 (1988)). Under N.J.R.E. 803(c)(27), a video-recorded interview of a child may be admitted on a hearing and preliminary finding that the "out-of-court statement is sufficiently reliable based on the time, content and circumstances of the statement." See id. at 389 (quoting State v. D.G., 157 N.J. 112, 128 (1999)).

Here, there was a hearing to determine the reliability of the video-recorded interview before it was admitted, as required by Smith and D.G. The interview happened the same day as the incident, Chesseri asked open-ended questions and did not attempt to elicit specific information from D.O., as he was trained to do using the Finding Words protocol, and D.O.'s statements in the video-recording were consistent with her statements to her mother. The questioning was not incessant nor leading, nor were there any suspect gaps in time. Further, rather than having a clear motive to fabricate the allegations, D.O. made the allegations against defendant despite her fear that her mother would be hurt.

The trial judge considered all these factors in making her determination the video-recording was admissible. Therefore, there is no indication the trial judge abused her discretion in finding the video-recording reliable and admissible under 803(c)(27) to provide evidence of D.O.'s account of events close-in-time to the incident, which is the purpose of the exception.

To address a defendant's constitutional rights of confrontation and cross-examination that are "so essential to the jury's duty to assess the credibility of witnesses," the New Jersey Supreme Court found that combining the admissibility of out-of-court statements under N.J.R.E. 803(c)(27) with the requirement that the under-age-twelve victim, "if available, testify at trial . . . will afford the jury an opportunity to evaluate the testimony relating the child's out-of-court statements in the context of the child's communicative skills, demeanor, and credibility as a witness at trial. It also affords the defendant a right of cross-examination and limited confrontation." D.R., 109 N.J. at 369-70.

Here, D.O. did testify and was subject to confrontation and cross-examination, so the jury was able to assess her credibility in person. Her in-court testimony fulfilled defendant's constitutional entitlement to confrontation

23

and cross-examination, and the trial judge did not abuse her discretion in admitting both the video-recorded interview and D.O.'s testimony.

Therefore, the trial judge did not abuse her discretion in admitting the three pieces of corroborative evidence. The evidence was not cumulative, as each piece of evidence was relevant for a different purpose, and the probative value was not outweighed by prejudice to defendant.

## II.

Defendant argues the statements of the prosecutor during both his opening statement and his summation constituted misconduct. We disagree.

"When a defendant fails to object to an error or raise an issue before the trial court, we review for plain error. We may reverse on the basis of unchallenged error only if the error was 'clearly capable of producing an unjust result.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting R. 2:10-2). To warrant a new trial for prosecutor misconduct, the prosecutor's conduct "must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Smith, 167 N.J. 158, 181-82 (2001) (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)).

Defendant asserts the prosecutor bolstered D.O.'s testimony in his opening when he told the jury they "in a sense" would hear from "six witnesses. . . ." Defendant asserts this unfairly emphasized D.O.'s on-camera testimony and went beyond the scope of what is permissible in openings – which should be "limited to the 'facts he intends in good faith to prove by competent evidence'" under State v. Wakefield, 190 N.J. 397, 442 (2007) (quoting State v. Hipplewith, 33 N.J. 300, 309 (1960)). This argument was not raised below, so it is reviewed for plain error.

An opening statement's purpose is to generally inform the jury of the "nature of the action and the basic factual hypothesis projected, so that they may be better prepared to understand the evidence." State v. Tilghman, 385 N.J. Super. 45, 55 (App. Div. 2006) (quoting Passaic Valley Sewerage Comm'rs v Geo. M. Brewster & Son, Inc., 32 N.J. 595, 605 (1960)). An opening statement cannot be argumentative or include issues or facts not legally admissible or able to be factually proven. Id. at 55-56.

Here, the prosecutor's opening included a list of witnesses the jury would see, including D.O., her mother, and the three detectives, and then told the jury they would see the video-recorded interview, which "in most instances . . . you don't see a recorded interview of a witness." He explained why it was permitted

in this case, making the statement that "in a sense, we have six witnesses, because you'll see the [fourteen]-year-old [D.O.] of 2017 and you'll see her as the [eleven]-year-old she was [on the date of the incident]." The statement generally informed the jury of the testimony so they would "be better prepared to understand the evidence," which is proper under Tilghman.

During summation, defendant objected to the prosecutor's assertions of D.O.'s credibility; however, when asked by the judge what relief was requested, defense counsel declined to ask for any. A prosecutor is not permitted in summation to bolster a witness's credibility with statements not based in evidence on the record, such as telling a jury a police officer "would not lie because of the 'magnitude' of charges that could be brought against them," or that police testimony should be accepted "not because of its believability but because the witnesses were policemen." State v. Frost, 158 N.J. 76, 85-86 (1999) (citations omitted). Rather, the prosecutor must "confine [his or her] comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Bradshaw, 195 N.J. 493, 510 (2008) (alteration in original) (quoting Smith, 167 N.J. at 178).

And while the prosecutor should not vouch for a witness's credibility, "[s]o long as the prosecutor's comments are based on the evidence in the case

and the reasonable inferences from that evidence, the prosecutor's comments 'will afford no ground for reversal.'" Ibid. (quoting State v. Johnson, 31 N.J. 489, 510 (1960)). The prosecutor "may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility." State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004) (citing State v. Scherzer, 301 N.J. Super. 363, 445 (App. Div. 1997)).

Defendant argues that in summation, the prosecutor improperly bolstered D.O.'s credibility, which was the central issue in the case, to make up for "deficiencies" of lack of DNA evidence, lack of photographs of the location of the incident, and failure to interview I.R., who was present at the time of the incident. Defendant contends the proffered argument that if D.O. were lying she would say defendant did more egregious acts "suggested that the prosecutor, because of his experience in litigating similar cases, knew certain hallmarks of credible testimony" and that the prosecutor's remarks that he would "characterize D.O.'s testimony as a very truthful and descriptive piece of testimony" was a personal assessment of D.O.'s credibility and "was accompanied by persistent comments instructing the jury that a 'reasonable person' could only conclude that D.O. had testified truthfully."

However, the statements, read in context, show that the prosecutor was responding to defense counsel's assertion that there was a discrepancy between D.O.'s video-recorded testimony and her trial testimony as to whether defendant left the room at some point. The prosecutor said he would characterize D.O.'s testimony as truthful and then pointed to D.O.'s testimony, contained in the record, where she corrected her account when defense counsel reminded her of her prior testimony. The prosecutor went on to note that D.O.'s testimony was consistent and that D.O. never said defendant touched her anywhere else, both things the jury could see and hear for themselves from the testimony on the record. The prosecutor noted that if someone is lying they are not bound to the truth and can say anything, pointed out what was <u>not</u> said by D.O. in her testimony, which the jury themselves could see and hear for themselves, and which defense counsel also brought up in her summation to cast doubt on D.O.'s allegations, and implied that it could be inferred that what D.O. did not say in her testimony indicated she was credible.

Arguing for a witness's credibility is permitted by <u>Walden</u> and <u>Bradshaw</u>, and the prosecutor did not inappropriately offer his personal opinion that D.O. was honest and would not lie, or that he felt defendant was guilty based on reasons not contained in the record. Therefore, the prosecutor did not engage in

misconduct in his summation, as his statements were all based on testimony contained in the record and reasonable inferences that could be made therefrom.

Defendant's additional assertions that prosecutorial conduct was capable of producing an unjust error warranting reversal under Rule 2:10-2 are without merit and not worthy of additional discussion in a written opinion. R. 2:11-3(e)(2).

## III.

Finally, a remand for resentencing is not required because the judge did not double count and did not err in finding and weighing aggravating and mitigating factors. In reviewing a trial judge's sentencing decision, we determine "whether the aggravating and mitigating factors found . . . were based upon competent, credible evidence in the record." State v. Yarbough, 195 N.J. Super. 135, 140 (App. Div. 1984). We apply a deferential standard of review unless the trial judge fails to identify relevant aggravating and mitigating factors; merely enumerates them; forgoes a qualitative analysis; or provides little insight into the decision. State v. Case, 220 N.J. 49, 65 (2014). Based on our review of the record, the trial judge's findings are adequately supported.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4238-17T4