# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4142-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GERY F. DESTRA,

     Defendant-Appellant.

_____

Submitted May 28, 2020 – Decided June 16, 2020

Before Judges Fuentes, Haas and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 15-09-1971.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

On September 3, 2015, an Essex County grand jury returned an eight-count indictment charging defendant with two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (counts one and two); three counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts three, four, and five); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7) (count six); and two counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (counts seven and eight).

Following a multi-day trial, the jury found defendant guilty of counts one, four, six, seven, and eight.[1] The jury was unable to reach a unanimous verdict on counts two and five.

At sentencing, the trial judge granted the State's motion to dismiss counts two and five. The judge then sentenced defendant to twenty-five years in prison on count one, with a twenty-five-year period of parole ineligibility pursuant to the Jessica Lunsford Act, N.J.S.A. 2C:14-2. The judge also sentenced defendant to a consecutive four-year term on count four, and concurrent terms on the remaining counts.[2] Finally, the judge placed defendant on parole supervision

---

[1] Prior to deliberations, the trial court granted the State's motion to dismiss count three of the indictment.

[2] Thus, defendant's aggregate sentence was twenty-nine years, subject to the parole ineligibility term discussed above.

for life and ordered him to comply with the registration requirements of Megan's Law, N.J.S.A. 2C:7-2.

On appeal, defendant raises the following contentions:

POINT I

IMPROPER ADMISSION OF -- AND INSTRUCTION ON -- "TENDER YEARS" EVIDENCE DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL, AND REQUIRES REVERSAL OF THE CONVICTIONS. (Not Raised Below).

A. The Failure of the Trial Court to Hold a Hearing on the Admissibility of Tender Years Evidence Through [The Victim's Mother] Requires Reversal of the Convictions.

B. The Inadequate and Erroneous Instruction on the Use of Tender Years Evidence Requires Reversal of the Convictions.

POINT II

THE AGGRAVATED ASSAULT CONVICTION SHOULD BE REVERSED BECAUSE THE STATE PRESENTED NO EVIDENCE FROM WHICH A REASONABLE JURY COULD FIND SIGNIFICANT BODILY INJURY.

POINT III

DEFENDANT'S FIRST STATEMENT SHOULD HAVE BEEN SANITIZED BECAUSE REFERENCES TO [THE DIVISION OF YOUTH AND FAMILY

3

SERVICES[3]] REMOVING HIM FROM HIS HOME AND PROHIBITING HIM TO BABYSIT HIS YOUNG NIECE IMPLIED A FINDING OF GUILT. (Not Raised Below).

POINT IV

IF THE CONVICTIONS ARE NOT REVERSED, THE MATTER MUST BE REMANDED FOR A RESENTENCING PROCEEDING IN WHICH THE TERM OF IMPRISONMENT ON COUNT SIX IS ORDERED TO RUN CONCURRENT WITH THE TERM OF IMPRISONMENT ON COUNT ONE.

After reviewing the record in light of the contentions advanced on appeal and the applicable law, we affirm defendant's conviction and sentence.

I.

When A.R. (Amy)[4] was six and seven years old, she lived with her mother and stepfather, but would regularly visit her biological father, who resided on the second floor of a two-family home. Defendant, who was a nineteen-year-old high school student, lived on the first floor of that residence with his family,

---

[3] This agency is now known as the Division of Child Protection and Permanency (DCPP).

[4] Pursuant to Rule 1:38-3(c)(12), we use pseudonyms to refer to the victim, the victim's mother, A.C. (Audrey), and the victim's friend, S. (Sally), to protect the victim's privacy.

including his niece, Sally. Amy visited her father's house approximately four times per week, and she and Sally would often play together during these visits.[5]

On April 22, 2015, Amy's mother, Audrey dropped Amy off at her father's home so she could run some errands. When Audrey returned to pick Amy up, she saw Amy say goodbye to Sally, but not to defendant. Audrey had never seen defendant at the house before.

Audrey testified that she thought it was "weird" that Amy did not say goodbye to defendant because she is a "very chipper . . . happy kid," so she asked Amy who defendant was. Audrey explained that Amy's body language changed when she questioned the child about the defendant. She testified that Amy "started feeling cold, like started feeling funny," and Audrey became concerned that something happened between defendant and her child.

On the car ride home, Audrey asked Amy if anyone had touched her private parts. Amy responded that she knew she could tell Audrey if anything happened. Audrey then told Amy, "if you're lying you're going to get beaten" and "it's very important that you tell me these things." Audrey explained that she made this statement because she knew "something wasn't right."

---

[5] Sally was approximately three years older than Amy.

Amy told Audrey that defendant choked her, and he also threatened to choke her if she did not let him touch her "butt." Amy also revealed that defendant makes her "suck on his private parts" and that "white stuff come[s] out."

Audrey became angry and drove back to the home to confront defendant. Defendant denied any inappropriate behavior and told Audrey that he had a girlfriend and did not "need to mess with no little girl." Audrey then called the police, who took her and Amy to the station to make a report.

The Division of Youth and Family Services (DYFS) then came to Audrey's house, and when the workers left, Audrey took Amy to the hospital. A few days later, hospital personnel informed Audrey that Amy had chlamydia.

Detective Eric Serio of the Essex County Prosecutor's Office Special Victims Unit testified that he conducted a forensic interview of Amy on April 23, 2015. The interview was video-recorded and played for the jury.

During the interview, Amy stated that defendant touches her "bottom" and her "boom boom"—meaning her vagina—with his "private" and takes out his "private" and "put[s] it in my mouth." Amy said that defendant would pull her pants down and touch his private on her bottom with her underwear on, and also put his private in her bottom. She stated that it "didn't feel good," and that he

had done this more than ten times. Amy also said that defendant put his private in her "boom boom" more than three times, and that defendant put his private in her mouth more than ten times. Amy added that when defendant put his private in her mouth, "white stuff would come out" and go in her mouth, and that it "taste[d] like pee." Amy told Detective Serio that defendant would call her into his room when no one was home, and if she did not obey him, he would choke her. Amy also reported that Sally saw defendant choking her on one occasion.

Amy said defendant told her not to tell anyone what he was doing to her. Audrey was the first person Amy told about the assaults. She told her mother because her mother said she would beat her if she did not tell the truth, "so I told the truth." Amy could not recall when the first or last time the inappropriate touching happened, but she believed she was six years old when it started. Amy told Detective Serio that defendant was the only person who did this to her.

Amy was nine years old when she testified at trial and her testimony was consistent with what she reported to her mother and the police on April 22, and 23, 2015. Amy testified she told her mother that defendant told her "to put his thing in my mouth." Amy stated that this occurred more than five times and that "white stuff" would come out of defendant's "private" and go "in [her] mouth."

Amy stated that when she would visit the home to see her father, defendant would call her into his bedroom, and she would kneel on the bed. Amy explained that defendant would "put his hand on my neck and, then pull[] it forward" so "he could put my mouth [on] his private." Amy also testified that on one occasion, defendant was watching "something nasty" on television, which depicted "people that put their private in their butt and in their mouth."

An emergency room physician who examined Amy on April 22, 2015, testified that his examination revealed no signs of trauma to Amy's vagina or rectum. However, he explained that children generally heal quickly, and the absence of tears or other injury to the tissue did not mean abuse had not occurred.

On April 29, 2015, defendant voluntarily accompanied police to the police station and, after waiving his Miranda[6] rights, he provided a statement, which was video-recorded and played for the jury. Defendant stated he knew Amy because she played with his niece, Sally. However, he denied ever touching or choking Amy and stated she was not allowed in his room.

Defendant agreed to provide the police with a urine sample before leaving the station. Defendant later submitted to additional testing for sexually

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

A-4142-17T4

transmitted diseases at the emergency room. A nurse practitioner testified that defendant tested positive for chlamydia. The nurse practitioner stated that although there are different strains of chlamydia, he was not aware of any screening test that could be used to determine whether one person's case of chlamydia matched another person's strain of the disease.

Armed with this information, the police arrested defendant on May 6, 2015. According to the detectives who arrested and later interviewed defendant, he did not appear to be under the influence of any illicit substances. At the police station, defendant waived his Miranda rights and gave a video-recorded statement to the detectives, which was played at the trial.

At first, defendant denied that he touched, had sex with, or was ever alone in the house with Amy. However, as the interrogation continued, defendant admitted to numerous sex acts with Amy, but claimed that Amy initiated all the encounters.

According to defendant, the first incident occurred when Amy entered defendant's bedroom after he had gotten out of the shower. Amy saw his penis, asked what it was, and touched it. Defendant told her to leave the room. Defendant claimed that Amy soon returned, put his penis in her mouth and

sucked on it for five seconds. Defendant said he did not ejaculate and again told the child to leave the room.

After that incident, defendant explained that Amy would come into his room and try to lie on top of him and pull his pants down. One time, Amy pulled defendant's pants down when he was on the couch in the living room watching television, and started to suck his penis.

Defendant told the detectives that on a third occasion, Amy entered his bedroom while he was watching pornography and masturbating. He stated that the child saw the pornography on the television. Defendant left the room to clean himself after he climaxed and returned to find Amy on his bed. Defendant stated that the young child pulled his pants down and started sucking his penis. Defendant told the detectives he ejaculated on the child's face. Defendant later admitted he had called the child to come into his room as he watched pornography, pulled his own pants down, and encouraged the child to suck his penis.

Defendant said that on yet another occasion, Amy entered his room, took her clothes off, and got into bed with him. He stated that Amy put her butt against him and rubbed it against his penis and he pulled her closer to him.

Defendant initially denied having vaginal intercourse with Amy. However, he stated that she rubbed her vagina close to his penis and that his penis bent rather than entering her vagina. Defendant later admitted it was possible that his penis "accidentally" slipped into Amy's vagina. He then told the detectives that he had penetrated the child with the tip of his penis. Defendant claimed that the vaginal penetration occurred just that one time, after which he refused Amy's advances.

Defendant denied that he ever choked Amy. Instead, defendant alleged that Amy grabbed him around the neck and choked him when he tried to remove her from his lap. He said he had to pinch her hand to get her to release her grip and forcibly remove her.

Defendant testified on his own behalf and denied he had any physical interactions with Amy. Defendant stated that he had not been truthful in his second interview with the police, because he was threatened by the detectives and believed they would not let him go unless he told them what they wanted to hear. He also claimed he was under the influence of Xanax when he gave the statement. On cross-examination, however, defendant admitted he told the detectives during both of his statements that he did not feel threatened or coerced, and understood he could stop the interviews at any time.

11

II.

In Point I.A. of his brief, defendant argues that his convictions must be reversed because the trial judge failed to hold a hearing on the admissibility of the tender years evidence that the State introduced through Audrey's testimony. While the judge erred by not conducting a N.J.R.E. 104[7] hearing concerning Audrey's testimony, we are satisfied that the error was harmless in light of other strong evidence of defendant's guilt.

We begin our analysis with the language of the tender years exception to the hearsay rule. N.J.R.E. 803(c)(27) states:

> A statement by a child under the age of 12 relating to sexual misconduct committed . . . against that child is admissible in a criminal . . . proceeding if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) . . . the child testifies at the proceeding . . . .

In interpreting this evidence rule, our Supreme Court has made clear that

---

[7]  "N.J.R.E. 104(a) provides the vehicle for the court to conduct a hearing to determine the admissibility of evidence that is subject to a condition before the evidence may be introduced at trial." State in Interest of A.R., 234 N.J. 82, 87 n.2 (2018).

> [b]efore admitting a child's out-of-court statement pursuant to N.J.R.E. 803(c)(27), the trial court must make certain findings at a [N.J.R.E.] 104 hearing. The court must determine whether "on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy." N.J.R.E. 803(c)(27). The statement's admissibility is also conditioned on either the child testifying or, if the child is unavailable as a witness, on the presentation of "admissible evidence corroborating the act of sexual abuse." Ibid. . . . The admissibility of a child's testimonial statement, therefore, will be conditioned on the child taking the stand. State v. P.S., 202 N.J. 232, 249 (2010) (noting the admissibility of child victim's statement is conditioned on not only "judicial finding of trustworthiness," but also "opportunity to cross-examine the child at trial" (quoting State v. R.B., 183 N.J. 308, 318 (2005)); see also State v. D.G., 157 N.J. 112, 124 (1999).
>
> [A.R., 234 N.J. at 102-03.]

Thus, the trial court must conduct a N.J.R.E. 104 hearing to evaluate the proposed tender years testimony and if it determines to admit the testimony in evidence, the court must make the required finding that "on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy." N.J.R.E. 803(c)(27).

The trial proceedings in this matter began on September 20, 2017, when a recall judge transferred this matter to the trial judge for trial. On that day, the prosecutor gave the trial judge a copy of her pretrial memorandum. In the

13

memorandum, the State advised the defense that it intended to rely upon N.J.R.E. 803(c)(27) to introduce the testimony of Detective Serio concerning the forensic interview he conducted with Amy, and the testimony of Audrey in connection with her discovery that defendant sexually assaulted the child. The prosecutor asked for a N.J.R.E. 104 hearing for both witnesses.

At that point in the proceedings, the judge had begun conducting a Miranda hearing to address defendant's motion to suppress the two statements he made to the police. Therefore, no further action was taken on September 20, 2017 on the tender years evidentiary issues.

The parties convened before the judge again on September 27, 2017. At that time, the witness needed for the Miranda hearing was not available and, instead, defense counsel had defendant take the stand to confirm his decision to proceed with the trial in lieu of entering a plea.

The next day, September 28, 2017, the Miranda hearing continued. During a late afternoon break in the proceedings, the parties and the judge began the N.J.R.E. 104 hearing concerning Amy's forensic interview with Detective Serio. They also agreed that jury selection could start on October 3, 2017 after the two hearings were finished. Neither the parties nor the judge mentioned the

State's still-pending oral application to determine the admissibility of Audrey's tender years testimony.

The parties returned to court on October 3, 2017 and completed the Miranda hearing and the N.J.R.E. 104 hearing on the admissibility of the forensic interview. At that point, defendant withdrew his objection to the admissibility of Detective Serio's tender years testimony.[8] On October 3, 2017, the judge entered a written order finding "that on the basis of time, content and circumstances of [the forensic video interview (FVI)] statement[,] there is a probability that the statement is trustworthy and the FVI of [Amy] will be admissible contingent upon the testimony of [Amy] at trial[.]"

The parties and the judge then proceeded with jury selection and, after the jury was chosen, the judge scheduled the trial to begin one week later, on October 10, 2017. If there was any further discussion between the parties and the court concerning Audrey's tender years testimony during this one-week hiatus, there is no record of it in the materials supplied to us on appeal.

On October 10, 2017, the parties returned to court. As the proceedings began, the prosecutor submitted a letter memorandum in support of the State's

---

[8]  Defendant also withdrew his objection to the admissibility of his first statement to the police, and the judge rejected his objections to the introduction of his second statement.

motion to admit Amy's disclosure of sexual abuse to Audrey under N.J.R.E. 803(c)(27). Defense counsel acknowledged his receipt of the memorandum, but raised no objection to the motion. The prosecutor told the judge that Audrey had not yet arrived at the courthouse and was still "[seven] minutes away." While that statement may be an indication that the prosecutor anticipated that the required N.J.R.E. 104 hearing would be held as soon as Audrey arrived, the judge instead brought the jury into the courtroom to begin the trial.

Once the jury was sworn, the judge gave the jurors her preliminary instructions, and then directed the parties to make their opening statements. When the attorneys concluded their remarks, the prosecutor requested a sidebar conference. The prosecutor told the judge that Audrey had arrived, and asked the judge, "so how do you want to do this?" Again, the record gives us no clear indication whether the prosecutor was referring to excusing the jury and beginning the N.J.R.E. 104 hearing, or whether she meant the commencement of the trial testimony. The judge instructed the prosecutor to "bring [Audrey] in." The prosecutor stated, "And in front of the jury we'll do the - - in front of the jury we'll do the - -[,]" and the judge replied, "The jury can sit." Neither the prosecutor nor defense counsel raised an objection to permitting Audrey to testify before the jury.

16

The prosecutor then called Audrey as her first witness, and Audrey testified in front of the jury concerning Amy's disclosures to her. The matter was then adjourned until the next day, and the trial continued from that point forward. Sometime on October 10, 2017, however, the judge issued a written order finding "that on the basis of time, content and circumstances of [Amy's statement to Audrey,] there is a probability that the statement is trustworthy and will be admissible as a tender years exception to the hearsay rule[,] N.J.R.E. 803(c)(27)."

While the record contains no explanation for the judge's decision to proceed in this fashion, it is clear that the judge erred by admitting Audrey's testimony concerning Amy's disclosures without first conducting a N.J.R.E. 104 hearing as required by N.J.R.E. 803(c)(27). We are also convinced that we must consider this issue even though the error was not brought to the attention of the trial judge. See R. 2:10-2 (stating that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result.").

At the outset, we note that the judge's mistake here was not a "structural error" that would automatically require a reversal. "A structural error . . . is a 'structural defect[] in the constitution of the trial mechanism, which def[ies]

17

analysis by harmless-error standards.'" State v. Camacho, 218 N.J. 533, 549 (2014) (second and third alterations in the original) (quoting Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991)). Structural errors "are so intrinsically harmful as to require automatic reversal . . . without regard to their effect on the outcome." Ibid. (quoting Neder v. United States, 527 U.S. 1, 7 (1999)) (alteration in original).

Here, the judge's mistake was a "trial error" that has been "defined as an 'error which occurred during the presentation of the case to the jury,' and therefore may 'be quantitatively assessed in the context of other evidence presented in order to determine whether it was harmless beyond a reasonable doubt.'" Id. at 547 (quoting Fulminate, 499 U.S. at 307-08). As the Supreme Court recently stated:

> An evidentiary error will not be found "harmless" if there is a reasonable doubt as to whether the error contributed to the verdict. State v. McLaughlin, 205 N.J. 185, 211-12 (2011) (citing [State v.] Macon, 57 N.J. [325,] 338 ](1971))]. The prospect that the error gave rise to an unjust result "must be real [and] sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Lazo, 209 N.J. 9, 26 (2012) (second alteration in original) (quoting [State v.] R.B., 183 N.J. [308,] 330 [2005]). As the Court noted in [State v.] W.B., "[c]onvictions after a fair trial, based on strong evidence proving guilt beyond a reasonable doubt, should not be reversed because of a technical or

evidentiary error that cannot have truly prejudiced the defendant or affected the end result."  205 <u>N.J.</u> [588,] 614 [(2011)].

[<u>State v. J.R.</u>, 227 N.J. 393, 417 (2017).]

The Supreme Court applied the harmless error standard in <u>D.G.</u> to reverse the defendant's conviction in a case where the trial court failed to conduct an N.J.R.E. 104 hearing and failed to make any of the findings required by N.J.R.E. 803(c)(27) prior to the admission of the tender years testimony of the child victim's aunt.  157 N.J. at 127-28.  In that case, the defendant did not make a confession to the police, and he "denied that any sexual contact occurred" during his trial testimony.  <u>Id.</u> at 122.  On the other hand, the victim repeatedly recanted her accusations against the defendant, which forced the prosecutor to impeach the victim on the witness stand.  <u>Id.</u> at 128.  In addition, the victim "made identical allegations against her natural father."  <u>Ibid.</u>  Under these circumstances, the Court held that the judge's error could not be considered harmless in light of the victim's overall lack of credibility and, instead, required the reversal of the defendant's convictions.  <u>Id.</u> at 127-28.

We reached a similar conclusion in <u>State v. W.L., Sr.</u>, 292 N.J. Super. 100 (App. Div. 1996), a case which the Supreme Court cited with approval in its <u>D.G.</u> opinion.  <u>D.G.</u>, 157 N.J. at 127-28.  In <u>W.L.</u>, the trial judge also failed to

conduct a hearing or make the findings required by N.J.R.E. 803(c)(27) before admitting the tender years testimony. 292 N.J. Super. at 117-18. There, as in D.G., the court found that "the vital issue of guilt was exceedingly close and any error that could have appreciably tipped the credibility scale would have to be regarded as plain error" requiring the reversal of the defendant's conviction. W.L., 292 N.J. Super. at 117 (internal citation and quotation omitted). As in D.G., the defendant in W.L. did not confess to committing the offenses prior to trial, and both of the child victims gave conflicting accounts of the alleged abuse to DYFS workers during their investigation. Id. at 104-05. In addition, we identified other critical errors, including the improper admission of expert testimony and inappropriate remarks made by the prosecutor in his opening and closing statements that also warranted the reversal of the verdict. Id. at 118.

On the other hand, in State in the Interest of S.M., 284 N.J. Super. 611, 621 (App. Div. 1995), we found that the judge's failure to hold the N.J.R.E. 104 hearing was harmless in a non-jury setting where the defendant failed to object, and the trial court made findings at the conclusion of the trial that made it clear that the court determined the statements were trustworthy.

Applying these principles, we conclude that the judge's error in admitting Audrey's testimony was harmless under the totality of the idiosyncratic

A-4142-17T4

circumstances presented in this case. Here, the State's proofs can fairly be described as overwhelming. Amy testified at the trial and her account of defendant's actions remained consistent both on direct and cross-examination. Unlike in D.G., the child never recanted any of her accusations, the prosecutor had no need to attempt to impeach her testimony, and Amy remained steadfast in her claim that defendant was the only individual who harmed her.

The State also presented the statements Amy made during Detective Serio's forensic video. These statements mirrored Amy's testimony at trial, including her explanation of how she came to first disclose defendant's assaults to her mother.

Defendant confessed to the assaults and described what occurred in detail. Although he claimed at trial that he lied to the police because he was under the influence of Xanax and just wanted to go home, the police observed no signs of intoxication. In addition, defendant admitted on cross-examination that he told the detectives he did not feel threatened or coerced, and understood he could stop the interviews at any time.

Both defendant and Amy tested positive for chlamydia. Defendant argued to the jury that the State should have attempted to perform additional tests to determine whether he and the child had the same strain of the disease. However,

the nurse practitioner who testified at trial stated he was unaware of any screening test that could accomplish this, and defendant presented no testimony, expert or otherwise, on this subject.

Under these circumstances, we are unable to conclude that the judge's failure to conduct a hearing prior to the admission of Audrey's testimony changed the result of defendant's trial. The jury heard Amy's explanation for her disclosure through Detective Serio's testimony and the child's own statements on the witness stand. The jurors also heard defendant's confession and his attempt to recant it at trial. As in S.M., the judge was aware that she needed to ensure that Amy's statements to Audrey were trustworthy as evidenced by the findings included in her belated October 10, 2017 order.

In short, when the evidence is viewed in its entirety, it is clear that the judge's error concerning the N.J.R.E. 104 hearing was not clearly capable of producing an unjust result. Therefore, we reject defendant's contention to the contrary.

While this record does not warrant the reversal of defendant's conviction, we would be remiss if we did not comment on some of the problems inherent in the approach adopted by the trial court in addressing the pretrial issues involved in this case. Rule 3:9-1(e) clearly requires the court to conduct pretrial hearings

"to resolve issues relating to the admissibility of statements by defendant, . . . sound recordings, and motions to suppress shall be held <u>prior</u> to the [p]retrial [c]onference" required by <u>Rule</u> 3:9-1(f). (emphasis added). The purposes underlying the rule are clear.

> First, it provides a technique for substantially expediting the conduct of the trial itself. The evidence questions covered by the rule ordinarily involve the taking of testimony outside the presence of the jury, and these voir dire hearings, if conducted during the trial, impair the continuity of trial as well as substantially imposing upon the time of the jurors. More significantly, these determinations, if made prior to jury selection, constitute interlocutory determinations which may be appealable by the State. This procedure also provides a more meaningful opportunity for a defendant to seek leave to appeal from the adverse determination.
>
> [Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 6 on <u>R.</u> 3:9-1 (2020).]

In addition to these considerations,

> adverse determinations of such questions, when they constitute, in effect, the sole defense, may result in a defendant's decision to plead guilty, and, if he or she wishes to appeal the ruling, entering a conditional plea pursuant to and in accordance with [<u>Rule</u>] 3:9-3(f). Finally, both parties are able to more effectively prepare their cases for trial if they know, by pretrial determination, which evidence will be inadmissible.
>
> [<u>Ibid.</u>]

As we observed over ten years ago,

> [w]ithout [these] pre-trial determination[s], a defendant is left in the dark about a critical part of the State's proofs against him. A defendant is entitled to know, in advance of trial, the full arsenal of evidence the State has amassed against him, including whether the State can legally present to the jury statements he may have made to the police. Such knowledge is not only indispensable to formulate a sound defense strategy at trial, but it is also essential in assisting a defendant in making the decision to accept or reject a prosecutor's plea-agreement offer. R. 3:9-1(b), (e).
>
> [State v. Elkwisni, 384 N.J. Super. 351, 360 n.3 (App. Div. 2006), aff'd, 190 N.J. 169 (2007).]

Moreover,

> [t]he State is also prejudiced if a determination as to the admissibility of a defendant's statements is not made before trial. Without advance notice of what evidence will be admitted at trial, the prosecutor: (1) is unable to assess rationally the strengths and weaknesses of the State's case; and (2) risks creating grounds for a mistrial, by unknowingly advising the jury, in the course of his/her opening statement, of information the court may subsequently determine to be inadmissible.
>
> [Ibid.]

Here, the judge began the proceedings on September 20, 2017 by immediately starting the Miranda hearing without providing any explanation other than that another judge had transferred the case to her for trial. After discovering a problem in the videotape replay system, the judge conducted the

24

pretrial conference. That conference should not have been held until after the pretrial hearings had been fully scheduled or completed. See R. 3:9-1(f) (requiring that the pretrial conference should not be held until "all motions have been decided or scheduled"). One week later, the judge prematurely conducted the plea cut-off, before resuming the Miranda hearing on September 28, 2017. The Miranda hearing and the N.J.R.E. 803(c)(27) hearing for Detective Serio were not completed until October 3, 3017.

As the apparent result of these uncoordinated managing efforts, the judge failed to schedule or conduct a N.J.R.E. 104 hearing to determine the admissibility of Audrey's tender years testimony. While the State had identified the need for a hearing on September 20, 2017, it did not submit its memorandum in support of the motion until after the jury had already been selected and the trial was about to begin on October 10, 2017. After the parties completed their opening statements, it appeared that the prosecutor may have believed the judge would next conduct the N.J.R.E. 104 hearing, but the judge instead instructed the prosecutor to call Audrey as a witness before the jury. Neither the prosecutor nor defense counsel objected and the judge never conducted the hearing required by N.J.R.E. 803(c)(27).

A-4142-17T4

While we understand that the judge was asked to step in for another judge to conduct a trial in this case, the matter should thereafter have been managed in accordance with the clear requirements of Rule 3:9-1. As we have concluded, the judge's error in failing to conduct the N.J.R.E. 104 was harmless beyond a reasonable doubt under all of the circumstances of this case. However, this mistake could have been entirely avoided had the judge simply followed the legal roadmap provided by the Rules of Court.

Accordingly, we strongly caution trial judges that the unintended, negative consequences that may flow from a lack of adherence to the pretrial procedures and calendaring requirements of Rule 3:9-1 certainly outweigh any minor inconveniences a brief delay in the start of a trial to ensure full compliance may engender.

III.

In Point I.B. of his brief, defendant also argues for the first time that the judge's instruction to the jury on the tender years testimony was "inadequate and erroneous." We disagree.

Jury instructions "must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Montalvo, 229 N.J. 300, 320 (2017)

(quoting State v. Singleton, 211 N.J. 157, 181-82 (2012)). If there is no objection when the jury instruction is given, "there is a presumption that the charge was not in error and was unlikely to prejudice the defendant's case." Ibid. (quoting Singleton, 211 N.J. at 182). Because defendant did not object to the judge's tender years testimony instruction, we review the judge's determination under a plain error standard. Ibid.

There is no Model Jury Instruction for the tender years hearsay exception. When there is no available model instruction, "the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." State v. Tierney, 356 N.J. Super. 468, 482 (App. Div. 2003) (quoting State v. Concepcion, 111 N.J. 373, 379 (1988)).

As noted in Section II of this opinion, N.J.R.E. 803(c)(27) provides that statements by children relating to sexual misconduct committed against them when they were under the age of twelve may be admitted at trial if there is a probability that the statement are trustworthy. To explain this concept to the jury in this case, the judge gave the jurors the following instruction:

> But first we will discuss what is referred to as tender years. A statement by a child under the age of [twelve] relating to sexual misconduct with or against the child is admissible in a criminal proceeding [i]f, among other considerations, it is determined that [on] the basis of the time, content and circumstances of the

27

statement[,] there's a probability that the statement is trustworthy. Here[,] [Audrey] testified on statements allegedly made to her by the victim, [Amy], on allegations of criminal conduct by the defendant.

Det[ective] Serio testified regarding the forensic video interview conducted by Det[ective] Serio with the seven[-]year[-]old victim, [Amy], where [Amy] made allegations of criminal conduct by the defendant. As jurors[,] you may give such weight to the testimony as you deem it entitled.

Contrary to defendant's contentions on appeal, the instruction did not improperly imply that the judge had found that either Audrey's or Detective Serio's testimony had been credible or trustworthy. Instead, the judge specifically referred to their testimony as mere "allegations" and she told the jurors they should "give such weight to the testimony as [they] deem it entitled."

We also note that the judge gave additional instructions to the jurors on the issue of witness credibility. For example, the judge instructed the jurors that they were "the sole and exclusive judges of the evidence, of the credibility of the witnesses and the weight to be attached to the testimony of each witness." The judge gave similar instructions during her final charge to the jury at the conclusion of the trial.

"[I]n reviewing any claim of error relating to a jury charge, the 'charge must be read as a whole in determining whether there was any error' . . . ."

State v. Gonzalez, 444 N.J. Super. 62, 70-71 (App. Div. 2016) (quoting State v. Torres, 183 N.J. 554, 564 (2005)). Applying this standard, we detect no reversible error in the judge's instructions on the tender years instruction to the jury. The instruction adequately explained the law to the jurors as stated in N.J.R.E. 803(c)(27) and advised them, consistent with the overall charge as a whole, that they were the sole judges of the credibility of Audrey's and Detective Serio's testimony concerning the statements Amy made to them.

IV.

In Point II of his brief, defendant asserts that the judge erred by denying his motion for a judgment of acquittal on the third-degree aggravated assault charge (count six) at the conclusion of the trial. Defendant argues that the State failed to produce sufficient evidence to prove he caused significant injury to the child victim when he choked her for refusing to accede to his assaults and to force her to do so. Again, we disagree.

A motion for acquittal must be granted "if the evidence is insufficient to warrant a conviction." R. 3:18-1.

> On a motion for judgment of acquittal, the governing test is: whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could

29

properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.

[State v. D.A., 191 N.J. 158, 163 (2007) (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)).]

We have stated that "the trial judge is not concerned with the worth, nature[,] or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State."  State v. DeRoxtro, 327 N.J. Super. 212, 224 (App. Div. 2000) (quoting State v. Kluber, 130 N.J. Super. 336, 341 (App. Div. 1974)).  Our review of a trial court's denial of a motion for acquittal is "limited and deferential," and is governed by the same standard as the trial court.  State v. Reddish, 181 N.J. 553, 620 (2004).

Applying these standards, we conclude that the State presented sufficient proofs at trial concerning the aggravated assault charge to survive defendant's motion for a judgment of acquittal.  A person is guilty of aggravated assault under N.J.S.A. 2C:12-1(b)(7) "if the person . . . causes significant bodily injury purposely or knowingly."  "'Significant bodily injury' means bodily injury which creates a temporary loss of the function of any bodily member or organ or temporary loss of any of the five senses."  N.J.S.A. 2C:11-1(d).

Here, the child victim testified that defendant choked her on numerous occasions by putting his hand around her neck when she refused to obey his

sexual demands. Amy told Detective Serio that defendant choked her if she refused to come when he called her into his room. She also stated that on one of these occasions, Sally saw defendant choking her. At trial, Amy testified that defendant would put his hand on her neck and pull it forward to force her to put his penis into her mouth. Amy also reported these assaults to her mother.

Defendant's use of these chokeholds on the child obviously caused a temporary loss of a bodily function, namely, Amy's ability to breathe, and therefore fell within the intendment of the statutory language of N.J.S.A. 2C:12-1(b)(7) and N.J.S.A. 2C:11-1(d). Therefore, we discern no basis for disturbing the judge's decision denying defendant's motion for a judgment of acquittal on the aggravated assault charge.

## V.

In Point III, defendant argues for the first time on appeal that because he and a detective mentioned that DYFS had initiated an investigation into his involvement with Amy during his first interview with the police on April 29, 2015, and this statement was admitted into evidence, his convictions must be reversed. This argument lacks merit.

In his April 29 statement, defendant told the detective that a DYFS worker advised him he could not continue to live in the house and babysit Sally while

31

the investigation was pending.  Defendant also said that the worker asked him if he had touched the child or if she "gave [him] oral sex[.]"  Defendant told the worker "no," and further stated that he never even let Amy come in his room.

Prior to the trial, the judge held a <u>Miranda</u> hearing concerning both of defendant's statements to the police.  After the hearing was completed, defendant withdrew his objection to the admission of the April 29 statement.[9]  In addition, defendant did not object to the statement when it was played to the jury at the trial.  Further, when defendant testified during the trial, his attorney referred to the statement on direct examination in order to allow defendant to tell the jury that he had denied the allegations from the outset.  However, defendant now asserts that the judge erred by failing to sua sponte redact the references to DYFS from the statement.

As noted above, when a party argues for the first time on appeal that an error occurred during trial, we analyze the argument under the plain error standard.  <u>R.</u> 2:10-2.  Applying that standard, we perceive no error, much less reversible error,  in the admission of defendant's unredacted, April 29 statement.  The references to DYFS were fleeting.  The prosecutor never referred to DYFS during her questioning of the witnesses or during her summation.  Moreover,

---

[9]  The judge found that defendant's May 6, 2015 statement was admissible.

defendant was able to use the statement to support the overall defense strategy that defendant had consistently denied all of the allegations of abuse as soon as they were raised.  Under these circumstances, we reject defendant's contention on this point.

VI.

Finally, defendant argues in Point IV that his sentence was excessive.  We disagree.

Trial judges have broad sentencing discretion as long as the sentence is based on competent credible evidence and fits within the statutory framework. State v. Dalziel, 182 N.J. 494, 500 (2005).  Judges must identify and consider "any relevant aggravating and mitigating factors" that "are called to the court's attention" and "explain how they arrived at a particular sentence."  State v. Case, 220 N.J. 49, 64-65 (2014) (quoting State v. Blackmon, 202 N.J. 283, 297 (2010)).  "Appellate review of sentencing is deferential," and we therefore avoid substituting our judgment for the judgment of the trial court.  Id. at 65; accord State v. O'Donnell, 117 N.J. 210, 215 (1989); State v. Roth, 95 N.J. 334, 365 (1984).

We are satisfied the judge made findings of fact concerning aggravating and mitigating factors and the imposition of consecutive sentences that were

33

based on competent and reasonably credible evidence in the record, and applied the correct sentencing guidelines enunciated in the Code. Accordingly, we discern no basis to second-guess the sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION